Lily KEYSER; Maria Sofia Robledo; Richard M. Cisneros, Plaintiffs–Appellants,

v.

SACRAMENTO CITY UNIFIED SCHOOL DISTRICT, a public entity; and James Sweeney, Defendants–Appellees.

No. 99–17562.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 31, 2000

Filed Feb. 7, 2001

Amended Sept. 12, 2001

---

Matthew J. Smith, Wilke, Fleury, Hoffelt, Gould & Birney, Sacramento, California, for the plaintiffs-appellants.

Michael W. Pott, Porter, Scott, Weiberg & Delehant, Sacramento, California, for the defendants-appellees.

Before: B. FLETCHER, O'SCANNLAIN, and GOULD, Circuit Judges.

Opinion by Judge O'SCANNLAIN; Dissent by Judge BETTY B. FLETCHER

## ORDER AND AMENDED OPINION AND AMENDED DISSENT

O'SCANNLAIN, Circuit Judge:

### ORDER

The opinion filed February 7, 2001, is hereby ordered amended as follows:

Slip Op. at 1627 [238 F.3d at 1140-41]: Delete the paragraph beginning with "In the free speech cases ....," and all paragraphs of part IV.B that follow. In their place, add the following new paragraphs, renumbering the remaining footnotes in the opinion as appropriate:

In the free speech cases in which we have held that circumstantial evidence created a genuine issue of material fact on the question of retaliatory motive, the plaintiff, in addition to producing evidence that his employer knew of his speech, produced evidence of at least one of the following three types. First, we have held that a plaintiff created a genuine issue of material fact where he produced the additional evidence that the "proximity in time between the protected action and the allegedly retaliatory employment decision" was one in which a "jury logically could infer [that the plaintiff] was terminated in retaliation for his speech." *Schwartzman v. Valenzuela*, 846 F.2d 1209, 1212 (9th Cir.1988) (internal quotation marks omitted). Second, we have held that a plaintiff created a genuine issue of material fact where he produced the additional evidence that his employer expressed opposition to his speech, either to him or to others. *Schwartzman v. Valenzuela*, 846 F.2d at 1212 (affirming the denial of summary judgment for employer because, in addition to producing evidence that his employer knew of his speech, the plaintiff produced a memorandum from his employer "warning him that he was not authorized to speak out"); *Allen v. Scribner*, 812 F.2d 426, 434–35 (9th Cir.1987) (reversing grant of summary judgment for employer because the plaintiff produced evidence that his employer knew of his speech as well as evidence that his employer *told* co-workers that the plaintiff should be removed because he expressed his opinions).

Third, we have held that a plaintiff created a genuine issue of material fact where he produced the additional evidence that his employer's proffered explanations for the adverse employment action were false and pretextual. *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1315–16 (9th Cir.1989) (reversing summary judgment because the evidence suggested that the defendant had a "desire to maximize the harm inflicted upon Soranno, rather than a concern with receiving the requested information").

Keyser and Robledo have not produced any such additional evidence. First, over two years separated the date on which Sweeney allegedly learned of Keyser and Robledo's charges, February 1995, and the dates on which Sweeney refocused their positions and recommended their demotions, March 1997 and May 1997, respectively.[4] Yet, in *Erickson*, we granted judgment for the *employer* notwithstanding the verdict where the plaintiff produced evidence that his employer knew of his speech as well as evidence that there was a proximity of approximately *three months* from the date on which the defendant became his employer and the date on which the defendant terminated him. *Erickson*, 960 F.2d at 803. Given that the proximity in this case was much longer than the period held insufficient in *Erickson*, Keyser and Robledo's claims fail *a fortiori*.

Moreover, Keyser and Robledo have produced no evidence that Sweeney expressed opposition to their speech, either to them or to others. Finally, they have produced no evidence that Sweeney's proffered reasons for their reassignment, the recommendations of the Vogel & Associates report coupled with his assessment of their abilities, were

false and pretextual.[5] As a result, they cannot create a genuine issue of material fact on the question of whether Sweeney's decision to recommend their reassignment was motivated by their speech. Thus, we conclude that summary judgment against Keyser and Robledo on their First Amendment claim was appropriate.[6]

Slip Op. at 1633 [238 F.3d at 1142–44]: Delete Judge Fletcher's dissent. In its place, add the amended dissent.

With these amendments, Judges O'Scannlain and Gould have voted to deny the petition for rehearing and the petition for rehearing en banc. Judge Fletcher has voted to grant the petition for rehearing and recommends granting the petition for rehearing en banc.

The full court was advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.

The petition for rehearing and suggestion for rehearing en banc are therefore DENIED.

## OPINION

We must decide whether a public employee has qualified immunity from suit for allegedly retaliating against subordinates who accused him of illegally using federal money.

### I

The Sacramento City Unified School District ("District") has a total kindergarten through twelfth grade enrollment of approximately 50,000 students. Defendant Jim Sweeney was hired by the District in August 1994 as Deputy Superintendent of the District. As Deputy Superintendent, he supervised thirteen high level administrators who comprised the Deputy Super-intendent's Cabinet. Until July 1997, among these thirteen administrators were plaintiffs Lily Keyser, who served as Administrator, Consolidated Programs, and Maria Sofia Robledo, who served as Administrator, Curriculum. The third plaintiff, Richard Cisneros, served until July 1997 as Administrator, Employee Relations.

In January 1995, Sweeney conducted mid-year formative evaluations with each of the Cabinet members under his supervision. Several administrators, including Keyser and Robledo, believed the evaluations violated District policy.

In February 1995, Keyser, Robledo, and Cisneros met with three then-members of the District's Board of Trustees ("Board"), Ida Russell, Mary Wimberly, and Louise Perez, to complain about Sweeney's evaluation practices. Keyser, Robledo, and Cisneros also charged Sweeney and two other administrators with spending federal Title I money to pay for consultants and other personnel in violation of federal guidelines on the use of the money. On February 13, 1995, Robledo and Keyser met with then-Board member Gasper Garcia to complain again about the misuse of federal money. Garcia stated in his declaration that he told Sweeney about these complaints. Several Board members also questioned Sweeney about his evaluation practices. Sweeney denies learning about the complaints regarding his evaluation practices and his alleged misuse of funds until Keyser, Robledo, and Cisneros filed this lawsuit.

On March 3, 1995, Sweeney recommended to the Superintendent that Keyser be reassigned. Although the reassignment was approved by the Board, Keyser kept her position because the personnel office gave her improper notice of the reassignment. Also in March 1995, Robledo, Keyser, and several other administrators

formed the Sacramento City Schools Management Association ("Association") and hired an attorney to complain to the Board about the evaluation practices. Two letters were sent to the Board on behalf of the Association.

Between November 1995 and February 1996, Sweeney was elevated from Deputy Superintendent to Acting Superintendent. In February 1996, he resumed his position as Deputy Superintendent. In November 1996, an election replaced three members of the Board with an allegedly pro-Sweeney slate. After the election, but prior to the time at which the new members took office, the Board unanimously voted to call for a federal investigation into Sweeney's alleged misuse of federal money.

In February 1997, Sweeney was elevated to Interim Superintendent. Around this time the Board commissioned an outside consultant, Vogel & Associates, to prepare an organizational study of the administration of the District.

In March 1997, Sweeney instructed Keyser and Robledo to refocus their efforts on tasks that ranked as higher priorities for the District. Shortly thereafter, Vogel & Associates issued its report to Sweeney and recommended that several existing administrative positions be eliminated and that a new organizational structure be created. Upon receiving this report, Sweeney decided to recommend to the Board that it adopt the new administrative structure. In addition, Sweeney recommended to the Board who among then-existing administrators should occupy the positions in the new structure, and who should be demoted to other positions. Sweeney recommended to the Board that Keyser and Robledo be among those administrators who were demoted, with Keyser demoted to a teaching position and Robledo demoted to a position as a principal. In addition, Sweeney recommended that Cisneros occupy a position in the new administrative structure, suggesting that he serve as Director, Employee Relations. The Board adopted all of these recommendations.

Keyser, Robledo, and Cisneros filed a complaint in federal district court on October 23, 1997. Among other things, they alleged 1) that Sweeney violated 42 U.S.C. § 1983 by depriving them of Equal Protection because he demoted them in retaliation for joining the Association, and 2) that Sweeney violated 42 U.S.C. § 1983 by depriving them of their First Amendment rights because he demoted them in retaliation for alerting the Board to his alleged misuse of federal money. On October 27, 1999, the district court granted summary judgment in favor of Sweeney on these two claims. First, the district court concluded that Sweeney did not know that Keyser, Robledo, and Cisneros were members of the Association and therefore could not have retaliated against them for joining it. Second, the district court concluded that Sweeney was entitled to qualified immunity because it was not clearly established that it was illegal to retaliate against Keyser, Robledo, and Cisneros for bringing charges of misuse of public funds to light.

On November 29, 1999, thirty-three days after the district court's judgment, Keyser, Robledo, and Cisneros filed their notice of appeal.

## II

■  The first issue we must confront is a jurisdictional one: whether the notice of appeal was timely filed. Under Federal Rule of Appellate Procedure 4(a)(1)(A), a notice of appeal must be filed within thirty days of entry of the judgment from which the appeal would be taken. In this case, the judgment was entered on October 27, 1999. The thirtieth day was Friday, November 26, 1999, which was the day after

Thanksgiving. The notice of appeal was not filed until Monday, November 29, 1999. Thus, the notice of appeal is timely only if the time for filing was extended three days.

The key determination in this regard is whether the time for filing was extended beyond the day after Thanksgiving, November 26, 1999.[1] The Federal Rules of Appellate Procedure state the following rule for the purposes of computing the time for filing under Rule 4: "Include the last day of the period unless it is . . . a day on which the weather or other conditions make the clerk's office inaccessible." Fed. R.App. P. 26(a)(3). In this case, it is undisputed that the Clerk's Office was officially closed on November 26. Regardless of whether the day after Thanksgiving counts as a legal holiday in California, the fact that the Clerk's Office was closed was sufficient to make it "inaccessible" within in the meaning of Rule 26. *See Latham v. Dominick's Finer Foods*, 149 F.3d 673, 674 (7th Cir.1998) (holding that, where Chief Judge closed the clerk's office even though it was not a holiday, "Rule 6(a) (and its counterpart appellate rule Fed. R.App. P. 26(a) . . . ) should be read to exclude any day on which the district court is either officially closed . . ., as here, or (as also here) inaccessible as a practical matter without heroic measures"). This conclusion is not altered by the fact that the Clerk's Office made available an after-hours "drop box" in which Keyser, Robledo, and Cisneros could have left their notice of appeal. *See Telephone and Data Sys., Inc. v. Amcell F Atlantic City, Inc.*, 20 F.3d 501, 502 (D.C.Cir.1994) ("We reject appellees' contention that the clerk's office was not 'inaccessible' because it was

physically possible to file papers in the district court's 24–hour 'drop box.' "). Thus, we hold that the notice of appeal was timely filed.

### III

■ With respect to the merits, Keyser, Robledo, and Cisneros challenge the conclusion that Sweeney has qualified immunity from suit due to the fact that it was not clearly established in 1997 that it is illegal to retaliate against a public employee for exposing his employer's alleged illegal use of federal funds.

■ In order to show that Sweeney was not entitled to qualified immunity on their retaliation claims, Keyser, Robledo, and Cisneros must show that two things were clearly established in 1997: 1) that their speech involved a matter of public concern, and 2) that the interests served by allowing them to express themselves outweighed the state's interest in promoting workplace efficiency and avoiding workplace disruption. *Brewster v. Board of Educ.*, 149 F.3d 971, 978 (9th Cir.1998). This balancing test between free speech and workplace disruption was first announced in *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

There is no dispute that Keyser, Robledo, and Cisneros can make the first showing. "Courts have . . . identified the *misuse of public funds*, wastefulness, and inefficiency in managing and operating government entities as matters of public concern." *Roth v. Veteran's Admin.*, 856 F.2d 1401, 1405 (9th Cir.1988) (emphasis added).

1. Because November 27 and 28 were Saturday and Sunday, respectively, if the last day for filing were pushed beyond November 26, then it would have been pushed all the way to Monday, November 29, which was the day on which the notice of appeal was filed. *See* Fed. R.App. P. 26(a)(3) ("Include the last day of the period unless it is a Saturday [or] Sunday. . . .")

Moreover, we hold that they can make the second showing as well. There is a series of cases in the Ninth Circuit establishing that the public's interest in learning about illegal conduct by public officials and other matters at the core of First Amendment protection outweighs a state employer's interest in avoiding a mere *potential* disturbance to the workplace.

Most recently, in *Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir.1999), we reversed a district court's grant of summary judgment to a public employer on qualified immunity grounds. *Id.* at 870. There, we held that it was clearly established that it would violate the First Amendment to fire several firefighters who had publicly criticized the city's preparedness for fires. *Id.* at 867–70. We concluded that the free speech interests in airing a subject "at the core of speech on matters of public concern," *id.* at 867, outweighed any disruption to the fire department. *Id.* at 869. We reached this conclusion because "there [was] no evidence of actual disruption in the provision of fire services" and a "nominal showing of potential disruption is plainly inadequate to outweigh the heavy interests (1) ... in speaking out about the lack of readiness of the fire department and (2) of the citizens ... in receiving such information." *Id.*

Similarly, in *Roth*, we upheld a district court's denial of summary judgment to a government employer seeking qualified immunity. *Roth*, 856 F.2d at 1408. We concluded that the employee's reports of "wastefulness, mismanagement, unethical conduct, violations of regulations, and incompetence" to his supervisor were "inherently of interest to the public." *Id.* at 1403, 1406. Moreover, although "both plaintiff and defendants concede[d] that some hostility developed among the staff," we concluded that " 'whistleblowing,' by its very nature, ... engender[s] some hostili-

ty and resistance." *Id.* at 1407. Because there were "underlying factual issues regarding the extent of office disruption," we affirmed the district court's denial of summary judgment. *Id.* at 1408.

Finally, in *Johnson v. Multnomah County*, 48 F.3d 420 (9th Cir.1995), we vacated a district court's grant of summary judgment in favor of a government employer on the ground that the balance of interests did not weigh in favor of the employer. *Id.* at 427. We concluded that the employee's allegations to her co-workers that her boss had abused his position to award contracts to his friends were of a subject matter in which there was "inherent public interest...." *Id.* at 425. We rejected the employer's "showing of disruption consist[ing of] evidence that [the employee's] statements interfered with the close working relationship [at the office]" because the employer "must do more than show mere disruption"; instead "it must show actual injury to its legitimate interests." *Id.* at 427. We concluded that "it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office." *Id.* (quoting *O'Donnell v. Yanchulis*, 875 F.2d 1059, 1062 (3d Cir.1989)). "In other words, the [employer] does not have a legitimate interest in covering up mismanagement or corruption and cannot justify retaliation against whistleblowers as a legitimate means of avoiding the disruption that necessarily accompanies such exposure." *Id.* at 427.

This case follows precisely in this line of precedent. Here, Keyser, Robledo, and Cisneros allege that they have been demoted for exposing misuse of public funds on the part of their boss, which is precisely the speech protected in *Roth* and *Johnson* and no less "at the core of speech on

matters of public concern" than the speech in *Gilbrook.* Moreover, in this case there is "no evidence of actual disruption," *Gilbrook,* 177 F.3d at 869, caused by Keyser, Robledo, and Cisneros' speech, let alone any evidence of "actual injury to ... legitimate interests" beyond the "disruption that necessarily accompanies" such speech, *Johnson,* 48 F.3d at 427.[2] Sweeney only argues in speculation that their speech must have significantly disrupted the provision of educational services by the District. He does not cite to a single page in the record where either he or a Board member describes any disruption. Indeed, he cannot claim that Keyser, Robledo, and Cisneros' speech disrupted his relationship with them because he denies even knowing that they made the accusations of his misuse of public funds until this lawsuit was filed.

Sweeney attempts to distinguish this formidable line of cases on two grounds. First, he points to *Brewster,* where we reversed a denial of summary judgment to

a government employer on qualified immunity grounds. However, it is *Brewster* that is distinguishable. In *Brewster,* we decided that qualified immunity was warranted because the particular balance of free speech and workplace disruption in that case was both unprecedented and too close to call to say it was clearly established. *Brewster,* 149 F.3d at 981. But unlike this case, the government employer in *Brewster* pointed to testimony in the record where other employees stated that Brewster's allegations of falsified attendance records had caused disruption at the workplace. *Id.* at 980–81. In addition, "Brewster's allegations of erroneous recordkeeping were ultimately determined to be false," which "weigh[ed] against [his] claim...." *Id.* at 981. Here, Keyser, Robledo, and Cisneros' charges of Sweeney's misuse of funds have not been deemed untrue; rather, their charges motivated the Board to call for an investigation of Sweeney.[3]

2. In *Moran v. Washington,* 147 F.3d 839 (9th Cir.1998), this court declared that, "in executing the *Pickering* balance, courts should not require government employers to demonstrate that an employee's speech actually disrupted efficient office operation; rather, 'reasonable predictions of disruption' are sufficient." *Id.* at 846 (quoting *Waters v. Churchill,* 511 U.S. 661, 673, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994)). Insofar as *Moran* admonishes courts to refrain from making actual disruption a *necessary* condition to prevailing in a *Pickering* balance, *Moran* is not inconsistent with *Gilbrook, Roth,* and *Johnson.* The latter cases stand for the propositions that the court should weigh the level of disruption against the value of the free speech and that a showing of actual disruption will weigh more heavily against free speech, not for the proposition that speculation regarding potential disruption is entitled no weight whatsoever. In any event, *Moran* noted that the workplace disruption hurdle for government employers is higher in cases, like this one, where the speech involved unlawful activities rather than policy differences. *Id.* at 849 n. 6.

3. Sweeney also contends that this case is more like *Brewster* than *Gilbrook, Roth,* and *Johnson* because Keyser, Robledo, and Cisneros' speech "was not directed to the public or the media, but rather to a governmental colleague." *Brewster,* 149 F.3d at 981 (internal quotation marks omitted). But the fact that they brought their charges to several members of the Board, which had supervisory power over Sweeney, is not sufficient to distinguish this case from *Roth* and *Johnson.* In *Roth,* the employee reported his allegations to "his superiors and to administrative personnel," but we still held that the employer was not entitled to qualified immunity. *Roth,* 856 F.2d at 1403. In addition, in *Johnson,* the employee made her allegations "to co-workers rather than to the press," but we nonetheless reversed the grant of summary judgment to the employer. *Johnson,* 48 F.3d at 425. Thus, *Brewster* cannot be distinguished from *Roth* and *Johnson* on the fact that the employee did not go to the media with his allegations because in all three cases the employees went to co-workers or supervisors with their allegations and not to the media. Therefore, the

Second, Sweeney argues, as found by the district court, that Keyser, Robledo, and Cisneros are high-level policy makers, which distinguishes this case from prior cases and weighs against Keyser, Robledo, and Cisneros in the balance between free speech and workplace disruption. In *Moran v. Washington*, 147 F.3d 839 (9th Cir. 1998), we surmised that it was "most doubtful that the Constitution ever protects the right of a public employee in a policymaking position to criticize her employer's policies or programs simply because she does not share her employer's legislative or administrative vision." *Id.* at 850. Unlike in *Moran*, however, Keyser, Robledo, and Cisneros' speech had nothing to do with Sweeney's "legislative or administrative vision," but instead charged him with illegally using federal money. Thus, the high-level policymaking exception described in *Moran* is inapplicable to this case. *See McVey v. Stacy*, 157 F.3d 271, 281 (4th Cir.1998) (Murnaghan, J., concurring) ("Although a high-level policymaker enjoys little First Amendment protection for her statements about her government employer's policy, the balance may be different for her statements preventing or exposing government wrongdoing."). Indeed, persons in the positions of Keyser, Robledo, and Cisneros are the people "who are most likely to be informed" about Sweeney's possible misuse of public funds, which entitles their speech to more protection under the First Amendment. *Gilbrook*, 177 F.3d at 867. Thus, we conclude that, at least on this record, Sweeney is not entitled to qualified immunity.

## IV

■ Sweeney next contends that even if he is not entitled to qualified immunity, he is nevertheless entitled to summary judgment on an alternate ground. We may affirm on any ground that has support in the record. *Gemtel Corp. v. Cmty. Redevelopment Agency*, 23 F.3d 1542, 1546 (9th Cir.1994).

■ When a government employee alleges that he has been punished in retaliation for exercising his First Amendment rights, courts must engage in a three part inquiry:

> To prevail, an employee must prove (1) that the conduct at issue is constitutionally protected, and (2) that it was a substantial or motivating factor in the [punishment]. If the employee discharges that burden, (3) the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct.

*Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (enumeration added). Sweeney argues that neither Keyser, Robledo, nor Cisneros has made out a genuine issue of material fact on the second prong, whether the allegations of misuse of public funds played a motivating role in Sweeney's decision to reassign them.

## A

With regard to Cisneros, there is no evidence that Sweeney knew Cisneros had leveled charges of misusing public funds against him. There were two instances during February of 1995 in which Keyser, Robledo, and Cisneros went to Board members to level these charges against Sweeney. According to Robledo's deposition testimony, during the first instance she, Keyser, and Cisneros all met with then-Board members Russell, Wimberly, and Perez to alert them to Sweeney's alleged misuse of public funds. According

fact that Keyser, Robledo, and Cisneros did not go to the media with their charges of

Sweeney's misuse of public funds does not entitle Sweeney to qualified immunity.

to then-Board member Garcia's declaration, during the second instance, only Robledo and Keyser came to him to repeat these allegations. The only evidence in the record to support the proposition that Sweeney learned about the charges against him is Garcia's statement in his declaration that he had told Sweeney about the substance of his meeting with Robledo and Keyser. There is no evidence that anyone told Sweeney about the earlier meeting with the other Board members, which was the only meeting that Cisneros attended. Thus, there is no evidence in the record to contradict Sweeney's statement in his declaration that he was unaware that Cisneros had made such allegations until this lawsuit was filed. Therefore, there is no evidence that Sweeney was motivated to reassign Cisneros because of the allegations he had made. Thus, we conclude that summary judgment against Cisneros on his First Amendment claim was appropriate.

B

■ With regard to Keyser and Robledo, there is evidence that Sweeney knew that Keyser and Robledo had charged him with illegally using public funds. As we noted above, Garcia stated in his declaration that he told Sweeney that Keyser and Robledo had complained about the alleged misuse of funds.

By producing the mere evidence that Sweeney knew of their charges, however, Keyser and Robledo do not create a genuine issue of material fact on the question of whether Sweeney's decision to recommend their reassignment was motivated by their charges. *See Umbehr*, 518 U.S. at 685, 116 S.Ct. 2342 ("To prevail, Umbehr must show that the termination of his contract was motivated by his speech on a matter of public concern, an initial showing that requires him to prove more than the mere

fact that he criticized the Board members before they terminated him."); *Erickson v. Pierce County*, 960 F.2d 801, 805 (9th Cir. 1992) (holding that judgment for the employer notwithstanding the verdict was appropriate because evidence of employer's knowledge of employee's political activity "simply does not support [employee's] claim that her [political activity] was a substantial or motivating factor in [employer's] decision to terminate her"); *Gillette v. Delmore*, 886 F.2d 1194, 1198–99 (9th Cir.1989) (holding that partial summary judgment against employee was appropriate because employee's evidence that employer "knew of his [political] activities" is "not sufficient to meet his burden in opposing summary judgment" because he has "shown no link between these events and his termination").

■ In the free speech cases in which we have held that circumstantial evidence created a genuine issue of material fact on the question of retaliatory motive, the plaintiff, in addition to producing evidence that his employer knew of his speech, produced evidence of at least one of the following three types. First, we have held that a plaintiff created a genuine issue of material fact where he produced the additional evidence that the "proximity in time between the protected action and the allegedly retaliatory employment decision" was one in which a "jury logically could infer [that the plaintiff] was terminated in retaliation for his speech." *Schwartzman v. Valenzuela*, 846 F.2d 1209, 1212 (9th Cir.1988) (internal quotation marks omitted). Second, we have held that a plaintiff created a genuine issue of material fact where he produced the additional evidence that his employer expressed opposition to his speech, either to him or to others. *Schwartzman v. Valenzuela*, 846 F.2d at 1212 (affirming the denial of summary judgment for employer because, in addi-

tion to producing evidence that his employer knew of his speech, the plaintiff produced a memorandum from his employer "warning him that he was not authorized to speak out"); *Allen v. Scribner*, 812 F.2d 426, 434–35 (9th Cir.1987) (reversing grant of summary judgment for employer because the plaintiff produced evidence that his employer knew of his speech as well as evidence that his employer *told* co-workers that the plaintiff should be removed because he expressed his opinions). Third, we have held that a plaintiff created a genuine issue of material fact where he produced the additional evidence that his employer's proffered explanations for the adverse employment action were false and pretextual. *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1315–16 (9th Cir.1989) (reversing summary judgment because the evidence suggested that the defendant had a "desire to maximize the harm inflicted upon Soranno, rather than a concern with receiving the requested information").

Keyser and Robledo have not produced any such additional evidence. First, over two years separated the date on which Sweeney allegedly learned of Keyser and Robledo's charges, February 1995, and the dates on which Sweeney refocused their positions and recommended their demotions, March 1997 and May 1997, respectively.[4] Yet, in *Erickson*, we granted judgment for the *employer* notwithstanding the verdict where the plaintiff produced evidence that his employer knew of his speech as well as evidence that there was a proximity of approximately *three months* from the date on which the defendant became his employer and the date on which the defendant terminated him. *Erickson*, 960 F.2d at 803. Given that the proximity in this case was much longer than the period held insufficient in *Erickson*, Keyser and Robledo's claims fail *a fortiori*.

Moreover, Keyser and Robledo have produced no evidence that Sweeney expressed opposition to their speech, either to them or to others. Finally, they have produced no evidence that Sweeney's proffered reasons for their reassignment, the recommendations of the Vogel & Associates report coupled with his assessment of their abilities, were false and pretextual.[5]

---

4. While it is true that Sweeney recommended that Keyser be reassigned in March of 1995, this event is not even a potentially viable adverse employment action because the reassignment never came to fruition. Thus, the relevant alleged adverse employment actions are Sweeney's refocusing Keyser and Robledo's positions and his recommending their demotions, which occurred in March 1997 and May 1997, respectively.

In making the proximity calculation with respect to these two events, we reject the dissent's invitations, Dissent at 12954, to ignore the more than one year during which Sweeney took no action against Keyser and Robledo, even though he knew they had made charges against him, and to count *only* the time after the Board voted to investigate the charges against Sweeney. Indeed, our precedent indicates that the proper starting point for measuring proximity is the time the "protected action" took place—here, February of 1995. *See Schwartzman*, 846 F.2d at 1212 ("Given 'the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between *the protected action* and the allegedly retaliatory employment decision,' a jury logically could infer that Schwartzman was terminated in retaliation for his speech.") (emphasis added). It is true that for eight of the months during this two year span, June 1996 until February 1997, Sweeney was assigned to a position in which he could not take action against Keyser and Robledo. Nonetheless, this still leaves roughly one and one-half years during which Sweeney could have taken action against Keyser and Robledo and did not do so. Given that this one and one-half years period was still much longer than the period held insufficient in *Erickson*, Keyser and Robledo's claims in this case still fail *a fortiori*.

5. The dissent argues that Keyser and Robledo did produce evidence of pretext. *See* Dissent

As a result, they cannot create a genuine issue of material fact on the question of whether Sweeney's decision to recommend their reassignment was motivated by their speech. Thus, we conclude that summary judgment against Keyser and Robledo on their First Amendment claim was appropriate.[6]

## V

Keyser, Robledo, and Cisneros also challenge the district court's conclusion that Sweeney was entitled to summary judgment on their Equal Protection claim that he retaliated against them for joining the Association.

It bears noting at the outset that Keyser, Robledo, and Cisneros' Equal Protection claims are somewhat unusual. They allege not that they were demoted because of their race, but that they were demoted because they joined an organization comprised largely of members of a particular race. This is unusual because claims for retaliation for joining an organization are usually brought pursuant to the First Amendment right to associate and to speak, rather than pursuant to the Fourteenth Amendment right to be free of racial discrimination, even when the organization is one created for the purpose of prohibiting racial discrimination. *See, e.g., Cromer v. Brown,* 88 F.3d 1315, 1331 (4th Cir.1996) (holding that state employer was not entitled to qualified immunity from employees' suit alleging § 1983 violation under the First Amendment for retaliating against him for joining association of black officers formed to bring complaints of discrimination).

In any event, Sweeney claims that he could not have retaliated against Keyser, Robledo, and Cisneros because of their membership in the Association because he did not know they were members.

Cisneros concedes that he was *not* a member of the Association, nor does he

---

at 757. It cites to three declarations—two by former Board members and one by a former Deputy Superintendant. None of these declarants offers direct evidence of pretext. Instead, each offers merely his own opinions and beliefs: former Board member Virgil Price opines that he has "seen a pattern with Sweeney that anyone who challenges anything [he] advocate[s] was in trouble"; former Board member Gaspar Garcia states that he "know[s] Sweeney to be a very vindictive individual" and that he "believes [Keyser and Robledo's demotions are] all because of [Sweeney's] penchant for retaliation"; and former Deputy Superintendant Charles Miura concludes that "it was clear that Sweeney wanted [Keyser and Robledo] out of the way because of their vocal opposition to … him in the past." Such "evidence," however, is not sufficient to foreclose summary judgment. *Cf. Blue v. Widnall,* 162 F.3d 541, 546 (9th Cir.1998) (explaining, in a Title VII case, that where evidence of pretext is not direct, but is instead merely "circumstantial evidence that tends to show that the employer's proffered motives were not the actual motives," such evidence "must be 'specific' and 'substan-

tial'"). Mere opinions and beliefs that Sweeney's actions were retaliatory, based on no specific or substantial evidence, are not enough to create a genuine issue of material fact on the issue of pretext.

6. The dissent describes a litany of "evidence" that Keyser and Robledo have produced beyond the fact that Sweeney knew of the charges they levied against him prior to his alleged adverse employment actions. *See* Dissent at 12952–56. None of these additional pieces of "evidence" fall into the three categories of additional evidence that we have deemed sufficient in the past to create a genuine issue of material fact. Rather, almost all of these pieces of additional "evidence" are merely the alleged adverse employment actions themselves. The existence of the alleged adverse employment actions themselves say nothing about *why* those actions were taken; they are probative of motivation only if one can read something from the *proximity* between the actions and the protected activity. And, as was noted above, the proximity in this case is far too long to survive summary judgment.

produce any evidence that Sweeney acted out of a belief that Cisneros was a member. Thus, summary judgment against Cisneros on this claim was appropriate.[7]

■ The story is different, however, with regard to Keyser and Robledo. First, both Keyser and Robledo claim to be members of the Association. Second, they argue that events surrounding the evaluations made Sweeney aware of their membership. In January 1995, Sweeney presented the members of his cabinet with interim evaluations. Robledo testified in a deposition that shortly thereafter she challenged Sweeney over his evaluation process and the contents of her evaluation. Keyser testified in a deposition that she refused to sign the evaluation and signed it only when Sweeney had his secretary stand over her desk waiting for her to sign it. Then, in March 1995, the Association sent the Board a letter complaining of Sweeney's evaluation practices. Although the letter was not addressed to him, Sweeney does not contend that he was unaware of the letter. Therefore, the question is whether a jury could have reasonably inferred that Sweeney put two and two together to conclude that the same people who had complained personally to him about the evaluations were the same people behind the Association that had complained to the Board via letter in March 1995. A jury could very easily infer as much. Thus, there is a genuine issue of material fact as to whether Sweeney knew Keyser and Robledo were members of the Association, and summary judgment would be inappropriate on that ground.

Although there is a genuine issue of material fact as to whether Sweeney knew Robledo and Keyser were members of the Association, this alone is not enough to survive a motion for summary judgment on their Equal Protection claim. To avoid summary judgment, Keyser and Robledo must "produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that [the] decision ... was racially motivated." *FDIC v. Henderson,* 940 F.2d 465, 473 (9th Cir.1991). In this case, that means Keyser and Robledo were required to produce evidence sufficient to permit a reasonable trier of fact to find that they were demoted because they wanted to associate with persons of a particular race.

Although courts in the Ninth Circuit are not bound by the formal Title VII disparate treatment burden shifting framework when trying § 1983 claims, *id.* at 471–72, because both disparate treatment and § 1983 claims require a showing of intentional discrimination, it is unsurprising that summary judgment decisions with regard to § 1983 claims are remarkably similar to their Title VII counterparts. *See id.* at 471–72 & n. 14; *cf. Gay v. Waiters' and Dairy Lunchmen's Union,* 694 F.2d 531, 538 (9th Cir.1982) ("[I]t is not inappropriate to allow section 1981 claimants to avail themselves of Title VII discriminatory treatment standards in proving a prima facie case."). In *FDIC,* the court affirmed summary judgment for the employer where 1) there was little to no direct evidence of discriminatory intent, 2) the employer offered legitimate, non-discriminatory reasons for its actions, and 3) the employee did not show these reasons were

---

7. Confronted with the fact that he was not a member of the Association, Cisneros argues in his reply brief that he is alleging a claim for discrimination based on his race, as well as discrimination on the basis of his association with persons of a particular race. Cisneros alleged only discrimination on the basis of his association in his complaint, before the district court, and in his opening brief. He cannot transform his claim for the first time in his reply brief.

false or pretextual. *FDIC*, 940 F.2d at 473–474. Precisely the same three conclusions can be reached with regard to Keyser and Robledo's claims.

■ First, Keyser and Robledo do not contend that they have produced any direct evidence of discriminatory intent, such as statements by Sweeney that he dislikes persons of a particular race, *see FDIC*, 940 F.2d at 473; *Gay*, 694 F.2d at 546, and instead rely solely on circumstantial evidence. Second, Sweeney contends that all of the demotions in this case were based on his assessment of the abilities of Keyser and Robledo, as well as the restructuring recommendations by Vogel & Associates. Third, Keyser and Robledo have pointed to no evidence that Sweeney's contention is false or pretextual.

Thus, under *FDIC*, Keyser and Robledo have failed to "produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that [the] decision … was racially motivated." *FDIC*, 940 F.2d at 473. Summary judgment in favor of Sweeney was therefore appropriate.

## VI

For the foregoing reasons, we affirm summary judgment against Keyser, Robledo, and Cisneros on both their First Amendment claims and their Equal Protection claims.

AFFIRMED.

BETTY B. FLETCHER, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from Part IV.B but concur in the remainder of the revised majority opinion. I commend the majority for revising the opinion to correct and clarify the law on the First Amendment claims in this appeal. However, I must dissent from its failure to consider all of the evidence adduced by Keyser and Robledo and to view the evidence in the light most favorable to them.

In Part IV.B, the majority affirms the district court's grant of summary judgment to Sweeney on Keyser and Robledo's First Amendment claims. The majority contends that Keyser and Robledo have produced only "mere evidence that Sweeney knew of their charges" and that this is not enough to create a genuine issue of material fact as to whether Sweeney's allegedly adverse employment actions were motivated by their charges. Majority Opinion at 751. If that were so, I would agree. However, viewing the evidence in the light most favorable to Keyser and Robledo, as we must, I conclude that they have presented sufficient evidence for their First Amendment claims to survive summary judgment.

The majority asserts that we have held that a plaintiff creates a genuine issue of material fact regarding an employer's retaliatory motive when the plaintiff produces, in addition to evidence that the employer knew of the protected speech, (1) evidence of proximity in time between the protected speech and the allegedly retaliatory employment decision, (2) evidence that the employer expressed opposition to the speech, or (3) evidence that the employer's proffered reason for the adverse employment action was false or pretextual. *Id.* at 751-52. It concludes that the district court was right to grant Sweeney summary judgment because Keyser and Robledo failed to provide any of these three types of evidence. *Id.* at 751-52. However, Keyser and Robledo have met their burden.

It is "well established that a plaintiff need not prove allegations with direct evidence and that circumstantial evidence can be sufficient" to prove that retaliatory intent was a motivating factor for a public

employer's adverse employment decision. *Erickson v. Pierce County,* 960 F.2d 801, 805 (9th Cir.1992) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716–17, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)); *see also Magana v. Commonwealth of the N. Mariana Islands,* 107 F.3d 1436, 1448 (9th Cir.1997).

In this case, Keyser and Robledo have presented the following circumstantial evidence that Sweeney's employment decisions were motivated by his desire to retaliate for the charges they brought against him. Sweeney evaluated Robledo and Keyser's job performance in late January 1995. In both cases, his evaluations were critical but constructive, suggesting ways in which Robledo and Keyser could improve their performance in their present jobs. In his evaluations, Sweeney told Robledo that she has "the skills to be most successful in a top leadership role." He told Keyser that he wanted to provide her with "maximum support." In February 1995, a Board member told Sweeney that Keyser and Robledo had alleged that Sweeney had misused federal funds. Less than a month later, Sweeney recommended that Keyser be reassigned. The Board approved the reassignment, but Keyser kept her position because of a defect in the notice given to her. In November or December of 1996, four "pro-Sweeney" Board members were elected. However, before the new members took office, the old Board voted unanimously to call for a federal investigation of Sweeney's alleged misuse of federal funds. After the new members took office, the Board made Sweeney Interim Superintendent on February 3, 1997, placing him in a position to affect Keyser and Robledo's employment status.[1] Sweeney "refo-

cused" Robledo's job and immediately removed her from his cabinet. In May 1997, Sweeney recommended that the Board adopt the Vogel reorganization plan. He presented the Board with personnel recommendations, including reassignment of Keyser and Robledo. On May 12, 1997, the Board adopted the Vogel plan and approved Sweeney's personnel recommendations.

Keyser and Robledo have presented evidence of *both* proximity *and* pretext. With regard to proximity, Sweeney took adverse employment action against Robledo within two to three months of the Board's voting for an investigation of the charges against him. Moreover, he acted as soon as he had power to do so. The majority discounts the fact that Sweeney's action towards Robledo occurred on the heels of the Board's vote for a federal investigation. Majority Opinion at 752 & n. 4. The Board's vote was the first indication that Keyser and Robledo's whistle-blowing might adversely affect Sweeney. Since the Board's vote resulted directly from Keyser and Robledo's charges, and since Sweeney knew this, the Board's vote is a salient point from which to measure the amount of time that elapsed between the plaintiff's protected conduct and the defendant's adverse action. The majority asserts that our precedent "indicates that the proper starting point for measuring proximity is the time the 'protected action' took place." *Id.* at 752 (citing *Schwartzman v. Valenzuela,* 846 F.2d 1209, 1212 (9th Cir.1988)). That simply was the starting point in that case. Nothing in our precedent compels us to measure from that point in every case. The present case demonstrates why such a rule would be inadvisable: Here the employer may

---

**1.** According to his deposition, Sweeney did not supervise Keyser or Robledo between June 1996 and February 1997.

not have viewed the employee's protected action as a threat until after the protected action had consequences and may not have decided to retaliate until then. In such cases, a plaintiff should be able to demonstrate proximity by measuring the time between the employer's adverse action and the consequences of the employee's protected action. The majority gives no reason for its failure to recognize the evidentiary value of the proximity in time between the Board's vote and Sweeney's action toward Robledo.

Similarly, the majority discounts the proximity in time between the Board's vote and Sweeney's successful reassignment of Keyser. But even if we assume that the Board's vote is not a salient point from which to measure proximity, Sweeney attempted to take adverse employment action against Keyser *less than a month* after hearing that she and Robledo had levied charges against him. Only a procedural failure (improper notice) saved Keyser's position. The majority ignores this evidence, claiming that, at the very least, one and one-half years separate the time when Sweeney learned of Keyser and Robledo's charges to the time he took action against them. *Id.* at 752 n. 4. The majority would have it that Sweeney's attempt to reassign Keyser less than a month after being informed that she and Robledo had alleged that he misused federal funds "is not even a potentially viable

adverse employment action because the reassignment never came to fruition." *Id.* But whether the employment action "came to fruition" is not the issue. The fact that Sweeney tried to reassign Keyser just after hearing about her whistle-blowing even though just before that time he had indicated his intent to keep her in her present position is clearly probative of Sweeney's motivation.[2] The majority fails to view the evidence through the lense that sheds the light most favorably on Keyser. The majority errs in not concluding that Keyser and Robledo introduced evidence of proximity that is sufficient to withstand Sweeney's motion for summary judgment.

Keyser and Robledo also have presented evidence of pretext. Here again the evidence, viewed in the light most favorable to Keyser and Robledo, shows that after he evaluated them in January 1995, Sweeney intended Keyser and Robledo to remain in their present jobs. It was only after he learned that they had brought charges against him that Sweeney had a change of heart and attempted to remove Keyser and Robledo from their positions. In addition, Keyser and Robledo submitted affidavits of two former Board members and a former Deputy Superintendent. All stated that they believed that Sweeney reassigned Keyser and Robledo because of the investigation and that Sweeney retaliates against anyone who opposes him.[3]

**2.** In addition, I note that the majority fails to include in its calculation the fact that Keyser was away on medical leave from May 1995 until March 1996.

**3.** Former Board member Virgil Price stated that he has "seen a pattern with . . . Sweeney that anyone who challenges anything [he] advocate[s] was in trouble. Typically, it started with ostracism and then removal from their position." Former Board member Gaspar Garcia stated that "I know Sweeney to be a very vindictive individual who has very little regard for legal constraints as I have watched

him demote or dismiss [Keyser and Robledo among others] since taking office in February 1997. I believe this is all because of his penchant for retaliation." Former Deputy Superintendent Charles Miura stated that it "was clear that Sweeney wanted [Keyser and Robledo] out of the way because of their vocal opposition to . . . him in the past." The majority discounts this evidence, asserting that Price, Garcia, and Muria's testimony is not "specific" and "substantial" circumstantial evidence of Sweeney's discriminatory intent. Majority Op. at 752-53 n. 5 (citing *Blue v. Widnall,* 162 F.3d 541, 546 (9th Cir.1998)

This is plainly more than a scintilla of evidence of pretext. It is enough to defeat Sweeney's motion for summary judgment.

Keyser and Robledo presented evidence of proximity and pretext. Thus, the majority is simply wrong when it states that none of this evidence "fall[s] into the three categories of additional evidence that we have deemed sufficient in the past to create a genuine issue of material fact." *Id.* at 753 n. 6. Nor is it correct to say, as the majority does, that this evidence is nothing more than "the alleged adverse employment actions themselves." *Id.* Circumstantial evidence such as we have here is sufficient to merit factfinding by a jury. *See Perez v. Curcio,* 841 F.2d 255, 258 (9th Cir.1988). Moreover, "courts have traditionally held that summary judgment is inappropriate when questions of motive predominate in the inquiry about how big a role the protected behavior played in the employment decision." *Peacock v. Duval,* 694 F.2d 644, 646 (9th Cir.1982) (internal quotation marks and citation omitted). The majority has taken on the role of the jurors. I would reverse the district court's grant of summary judgment in Sweeney's favor on Keyser and Robledo's First Amendment claims and remand for trial by real jurors. Accordingly, I dissent.

(Title VII case)). The majority mischaracterizes the evidence. The testimony is certainly specific: Each affiant testified that he believed that Sweeney removed Keyser and Robledo in retaliation for their actions against him. The testimony is also substantial: Each testified that his belief was based on observations of the way Sweeney typically treated subordinates who crossed him. This sort of evidence could lead a rational factfinder to conclude that Sweeney's proffered explanation was pretextual. Thus, the evidence is sufficient to defeat Sweeney's motion for summary judgment. *Cf. Magana,* 107 F.3d at 1448 ("The evidence presented is highly circumstantial and the allegations have yet to be measured against conflicting evidence and inferences to be drawn therefrom. At this stage of the proceedings, however, the circumstantial evidence of intent presented by Appellant is sufficient to create a genuine issue of material fact and to defeat a summary judgment motion.").