COMMONWEALTH UTILITIES CORPORATION, Plaintiff,

v.

GOLTENS TRADING & ENGINEERING PTE LTD., a foreign corporation, Defendant,

and

In–Place Machining Company, Inc., a foreign corporation, Defendant–third–party–plaintiff–Appellant,

v.

MAN B & W Diesel AG, Third–party–defendant–Appellee.

No. 01–16614.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 2002.

Filed Dec. 16, 2002.

---

Thomas Roberts, Dooley Lannen Roberts & Fowler LLP, Tamuning, Guam; Elton John Bain, Kessner Duca Umebayashi Bain & Matsunaga, Honolulu, Hawaii, for the defendant-third-party-plaintiff-appellant.

Richard W. Pierce, White Pierce Mailman & Nutting, Saipan, Mariana, Pacific; Christopher H. Mansuy, De Orchis, Walker & Corsa, LLP, New York, NY, for third-party-defendant-appellee.

Before SCHROEDER, Chief Judge, ALARCÓN and FISHER, Circuit Judges.

## OPINION

ALARCÓN, Circuit Judge:

Third–Party–Plaintiff–Appellant, In-Place Machining Company, Inc. ("IPM"), appeals from the district court's order for summary judgment dismissing IPM's claim for contribution from Third–Party–Defendant–Appellee, MAN B & W Diesel AG ("MAN"). The dispute arises from the failure of a large diesel generator, owned and operated by Commonwealth Utilities Corporation ("CUC"), shortly after the generator had received parts and undergone repairs by Goltens Trading & Engineering PTE LTD. ("Goltens") and IPM. CUC filed claims against Goltens for breach of warranty and negligence, and IPM for negligent repair. IPM filed a

third-party cross-claim for indemnity and contribution against MAN for MAN's allegedly negligent role as a consultant to, or supervisor of, the negligent repair. Goltens and IPM settled their dispute with CUC, and IPM dropped its cross-claim against MAN for indemnity. IPM persisted in its contribution cross-claim against MAN. The district court dismissed IPM's cross-claim on summary judgment, holding that IPM did not produce sufficient evidence to raise a triable issue of fact as to a breach of a legal duty by MAN in its relationship with CUC. IPM appeals the dismissal.

Because IPM has failed to produce facts necessary to sustain a claim in tort, we affirm the district court's grant of summary judgment.

I

CUC owned several large electrical generating diesel engines designed by MAN and manufactured under license by Mitsubishi Heavy Industries. In April 1995, CUC hired IPM to repair a crankpin on engine number six. In early January 1996, CUC contracted with MAN for the scheduled-maintenance overhaul of engines four and five. Later in January 1996, engine number eight was substituted for engine number five in the maintenance overhaul contract between CUC and MAN. On January 23, 1996, before work on the scheduled overhaul began, engine eight failed, and the crankpin and journal of its number nine cylinder were damaged.

In early February 1996, MAN technician Gunter Molch ("Molch") performed a visual inspection of a fully assembled engine number eight. Molch submitted his findings from that inspection to CUC Power Plant Manager Frank Lizama ("Lizama") and to his home office in Germany. Molch's report listed the damage that was noted on his visual inspection of the fully assembled engine. He speculated regarding the damages that could be found on disassembly. He also made suggestions as to the repairs that might be required. He urged that all work be done by an authorized repair shop with some of the parts needing to go to MAN's shop in Germany for "reconditioning." Molch's report warned that severe damage to the crankpin should be expected. Molch reported that "crank web deflection was taken and the values found [were] still within [the] accepted limit." Nevertheless, he urged that the crankpin be tested for roundness, hardness, cracks, roughness, angular deviation, and deviation from parallelity. Molch stated that the decision as to the proper reconditioning method was contingent on the results of this further recommended testing. Molch did not create a definitive list of existent crankpin problems, nor did he propose solutions to any as yet undetermined problems.

A copy of Molch's report was attached to an internal memorandum regarding the procurement of the crankpin refurbishment, sent from CUC's acting power generation manager to a CUC procurement and supply advisor. This internal memorandum stated that the desired outside-contractor bid would be for refurbishing the number nine crankpin and to "check [its] hardness, roundness, roughness and presence of crack."

CUC did not follow Molch's advice. In March of 1996, CUC contracted with IPM to refurbish engine eight's malfunctioning number nine crankpin on site, as IPM had done the previous year with engine six, rather than send the crankpin to be repaired off-site at MAN Germany, as Molch had recommended in his report. CUC contracted with IPM in early March of 1996, to refurbish engine eight's number nine crankpin. IPM described its charges to CUC as including, "Hardness Checking,

Crack Detection, and Crankpin Refurbishment."

From February to April of 1996, any work done by MAN on engine eight was not done pursuant to the previously executed engine maintenance-overhaul contract, but on an hourly basis. The purpose of this hourly contract, according to Frank Lizama, CUC's Power Plant Manager, was to use MAN technicians "to help us on technical matters with our MAN B & W engines." Two other CUC personnel stated in deposition testimony that they believed MAN to have been a "technical advisor" to CUC. At least one of those witnesses, however, believed all three contractors, Goltens, IPM, and MAN, to be such technical advisors.

MAN technician Ernst Miller ("Miller") informed his home office on March 5, 1996, that "I am commencing already with dismantling Engine Number 8 in preparation for honing, grinding of the crank pin motor." Miller's work was not done pursuant to MAN's contract with CUC to overhaul engine eight, but rather pursuant to the hourly contract to help CUC with "technical matters" concerning the engines. Miller disassembled engine eight, and sometime in April 1996, Miller and Molch measured the number nine crankpin for straightness. Miller testified that their measurements determined that the crank shaft was not bent beyond satisfactory tolerances. This determination was reported to CUC.

IPM performed the contracted on-site work on engine eight's number nine crankpin journal in May of 1996. IPM technician Allen Breitbach ("Breitbach"), testified at his deposition that he believed MAN's purpose in being at CUC's power plant was to work on another engine and to discuss what IPM was doing on engine eight. Breitbach believed that he had discussed MAN's manufacturer's tolerances for crankpin hardness with one of MAN's on-site technicians. Breitbach did not recall any discussion with MAN regarding the "specifications or tolerances on this particular crankpin." Further,

Breitbach testified that IPM worked independently, and that it is not his practice to consult with the customer in regard to his interim readings or machining progress. Breitbach did recall, however, mentioning the problems IPM was having bringing down the crankpin hardness with a MAN employee on an occasion outside of the CUC facilities. Breitbach testified that on his first day at the CUC plant, at least one MAN employee witnessed him taking "run out readings" on the crankshaft. That reading showed that the shaft was running only slightly out of true. Breitbach testified that an unidentified MAN employee made a thumbs up gesture, which he interpreted as signifying that the crankshaft was within tolerance. Nevertheless, in his deposition testimony, Breitbach acknowledged that the ultimate responsibility for determining alignment always falls to the party turning down the crankpin journal. Breitbach testified that, as the party turning down the crankpin journal, it was IPM's responsibility to check the crankpin's alignment.

Breitbach could not recall if anyone told him that MAN was in charge of IPM's work. He testified that Lizama stated that if MAN accepted IPM's work, then the work was fine with him. Breitbach testified that MAN approved the final work of IPM through visual inspection and the use of measuring devices. Breitbach believed that while MAN did not have the responsibility to supervise IPM's work, both firms were working together on the project.

Although Breitbach reported almost daily conversations with MAN staff working nearby, the only "input or direction" given

by MAN as to the work IPM was performing was to tell IPM that the crankpin hardness was unacceptably high in spots before IPM's work began. Breitbach stated further that it "would be a logical assumption" that he knew before talking to MAN employees that the crankpin hardspot tolerances were too high.

Breitbach testified that he did not "remember" if a MAN employee made the decision to leave two small over-tolerance hard spots on the crankpin. But he believed that CUC or MAN must have made that decision, because he testified "it was not me." Breitbach testified that in the past he had left hard spots with no ill effects on future crankpin operation, and that he may have advised CUC of those experiences. This time, however, engine number eight failed at the number nine crankpin approximately one month from the time it had been restored to service.

CUC hired experts Herbert Roeser ("Roeser") and Randy Kent ("Kent") to determine the cause of engine eight's second failure. IPM has relied on their testimony in its cross-claim against MAN.

Roeser and Kent blamed the second crankpin failure on IPM's refurbishment method. Roeser and Kent testified that the crankpin hard spots created by the first failure were too hard to be effectively removed using IPM's method. The extreme hardness of the spots caused IPM's single-point-cutting tool to dull quickly, causing friction heat in the crankpin and reintroducing hard spots to the crankpin as a result of the refurbishment procedure. Roeser testified that "[t]he whole machining procedure should have been a different one, not the one they used." Roeser opined that, while no crankshaft runs completely straight, the shaft in engine eight should have been heat treated to eliminate distortion arising from the first failure. Roeser stated that he would have advised against on-site heat treating of a crankshaft and would have advised that the shaft be removed and sent to a shop for heat treating. Regarding IPM's method of refurbishment, Roeser stated: "[I]n this case, with the hardness readings as has been measured here, I would never attempt to refurbish the journal the way this was done." As to IPM's responsibility for failing to heat treat the crankpin, Roeser stated that: "Any company that involves themselves in any type of refurbishment should know where their limitations are and when they need assistance."

Roeser further asserted that an on-site technician employed by a manufacturer would not be qualified to advise on the necessity of heat treating a shaft without help from the technical department at the home office. Additionally, he testified that a service technician ordinarily would have speculated on heat treating the shaft: "Only if he's been sent out for that specific job that involves the crankpin journal. They've very, very strict rules, all engine manufacturers. You only do what you're asked to do. You only involve yourself with a machine that you have been contracted to do." Roeser testified that, if a firm had contracted to rebuild a machine, then a service technician would have reported the extensive crankpin damage to his home office, and the home office would make a "very safe recommendation" to the plant owner.

## II

A grant of summary judgment is reviewed de novo. *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir.2002).[1] We have

1. This court has jurisdiction pursuant to 28 U.S.C. § 1291 and 48 U.S.C. § 1821. The appeal was timely filed. The district court

ruled that: "Although summary judgment in a negligence action is generally disfavored, it is proper where the facts are essentially undisputed and only issues of law remain." *Camacho v. Du Sung Corp.*, 121 F.3d 1315, 1317 (9th Cir.1997) (citing *Flying Diamond Corp. v. Pennaluna & Co.*, 586 F.2d 707, 713 (9th Cir.1978)). In *Camacho* this court held that: "Because we find no legal basis on the *facts presented* for holding the [defendant] liable, we affirm the grant of summary judgment in favor of [the] defendants." *Id.* at 1316 (emphasis added). In *Flying Diamond* we held that "summary judgment is proper where the facts are undisputed and only one conclusion may reasonably be drawn from them." *Flying Diamond*, 586 F.2d at 713. Thus, as is required by Rule 56 of the Federal Rules of Civil Procedure, IPM "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56. The Supreme Court has held that: "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). We are free to affirm a grant of summary judgment on any grounds supported by the record. *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 750 (9th Cir.2001).

In a diversity case a district court must apply the substantive law of the jurisdiction in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). Because this action was brought in the district court for the CNMI, CNMI law constitutes the appropriate rule of decision.

As we noted in *Yokeno v. Mafnas*, 973 F.2d 803, 808 n. 3 (9th Cir.1992):

Under CNMI law, in the absence of written or local customary law to the contrary, the common law is applicable, as expressed in the restatements of the American Law Institute (A.L.I.) and to the extent not expressed in the restatements, as generally understood and applied by courts in the United States.

*Id.* (citing 7 N. Mar. I.Code § 3401 (1984)). Neither party offers CNMI law contrary to the *Restatement (Second) of Torts* (1977) ("*Restatement*"). Furthermore, the CNMI Supreme Court has held that its "ability to formulate the common law ... is constrained by the statutory mandate to apply the common law as enunciated by the Restatements." *Castro v. Hotel Nikko Saipan, Inc.*, 4 N. Mar. I. 268, 275 (1995).

IPM's claim for third-party contribution against MAN is premised on MAN's liability as a joint tortfeasor. *See* 7 N. Mar. I. § 4302 (1999) (allowing for contribution among joint tortfeasors). IPM asserts that MAN was negligent in the performance of its duties for CUC. IPM submits that MAN had legal duties to CUC that were triggered by MAN's contractual obligation to assist CUC in technical matters regarding the MAN designed engines. IPM avers, citing *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994), that a tort may arise from a legal duty imposed independently from a contractual duty. *Id.* at 459–60. Even if we assume that MAN's conduct can give rise to tort liability, IPM has not proffered sufficient evidence to create a genuine issue for trial on its tort claims.

IPM offers three different theories for MAN's alleged tortious liability. IPM

had jurisdiction pursuant to 28 U.S.C. § 1332 and 48 U.S.C. § 1822.

first directs us to § 323 of the *Restatement* which provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his *failure to exercise reasonable care* to perform his undertaking, *if* (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's *reliance* upon the undertaking.

*Restatement* § 323 (emphasis added). The gravamen of this section is that, to be liable for negligence, MAN would have had to have failed to exercise reasonable care pursuant to its hourly contract to help CUC on technical matters regarding MAN designed engines.

IPM maintains that "MAN's failure to advise CUC of [IPM's inadequate refurbishment method] fell below the [applicable] standard of care." But the record shows that CUC did not follow MAN's recommendation in hiring IPM. Molch's report had urged CUC to employ an authorized repair shop and to send some parts for off-site reconditioning in Germany. IPM did not offer evidence that it was an authorized shop and it specifically performs an on-site reconditioning service. Further, IPM's assertion that expert witness Roeser would have expected MAN to make recommendations regarding heat treating of the crankpin in refurbishment is not supported by the record. Roeser stated that the usual standard of care for on site technicians such as MAN's Miller and Molch would be not to make such a recommendation unless specifically contracted to do so. IPM did not present evidence of such a contract.

Further, IPM asserts that "MAN failed to detect that the crankshaft was bent when it measured it for this very purpose." Evidence of unacceptable crankshaft bend, however, is not clearly indicated by the record. Roeser stated that all crankshafts have some deviation from true, and thus that the number nine crankpin would necessarily "not run straight." He attributed the failure of the crankpin to being refurbished on-site without heat treatment. Most importantly, IPM's technician Breitbach admitted that the ultimate responsibility for determining crankshaft alignment always falls to the party turning down the crankpin journal, which in this case was IPM.

IPM has not adduced anything more than "colorable" evidence of a breached standard of care and its causal link to CUC's harm. Therefore, IPM has not met its Rule 56 burden "to set forth specific facts showing a genuine issue for trial," Fed.R.Civ.P. 56, under § 323 of the *Restatement.*

■ Second, IPM argues that MAN is liable under § 552(1) of the *Restatement* which provides that:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance upon the information,* if he fails to exercise *reasonable care or competence* in obtaining or communicating the information.

*Restatement* § 552(1) (emphasis added).

IPM asserts that: "In the Molch report, MAN supplied CUC with false information for CUC's guidance in its business transactions, *i.e.,* in CUC's determination of what was needed to fix Engine No. 8." IPM does not point to an example of "false information" being supplied to CUC or to

CUC's reliance on such information. IPM, does, however, point to Molch's failure to state in his report, written after visually inspecting the fully assembled engine eight, "that this particular crankpin journal could *not* be remachined on-site or anywhere else without 'heat treating' it to remove the 'hard spots,' 'residual stresses' and 'heat affected bands' caused by the January 23, 1996 engine failure that apparently led to the second failure."

IPM's assertions conflict with the facts in the record. First, the problematic "hard spots" and "heat affected bands" arose from IPM's inappropriate refurbishment method. Additionally, Molch's report, made after only a visual inspection of the assembled engine, did not purport to be a definitive diagnosis of every crankpin problem and its respective cure. Finally, expert testimony established that an on-site service engineer such as Molch would not be qualified to make the determination that heat treatment was required in the refurbishment of a specific crankpin. Thus, IPM has failed to provide the minimum indicia of fact required to sustain this facet of its cross-claim.

Finally, IPM alleges tort liability arising under § 229A of the *Restatement*, which states in pertinent part, "one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade." *Restatement* § 229A. IPM failed to introduce facts that would establish that MAN breached the standard of "skill and knowledge" expected of it. Neither expert witness testified that MAN breached its expected standard of care and neither expert blamed MAN for the failure of engine eight. IPM failed to introduce evidence from which *Restatement* § 229A liability could be assessed to MAN.

Because IPM has failed to supply " 'sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial,' " MAN's motion for summary judgment was properly granted by the district court. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## III

■ Alternatively, IPM requests that we certify a question of CNMI law to the CNMI Supreme Court.[2] We have ruled that: "Use of certification rests in the sound discretion of this court." *McLinn v. F/V Fjord,* 744 F.2d 677, 681 (9th Cir.1984) (citing *Lehman Bros. v. Schein,* 416 U.S. 386, 391, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974)). In *McLinn* we held that: "We believe that particularly compelling reasons must be shown when certification is requested for the first time on appeal by a movant who lost on the issue below." *Id.* Here, no such compelling reason has been shown.

■ In *White v. Celotex Corp.,* 907 F.2d 104 (9th Cir.1990), we held that it was not necessary to certify a novel question of law

---

**2.** The requested question reads as follows:

Under CNMI law, where an engineering firm contracts to provide professional services to a utility in connection with the inspection, repair and overhaul of power generating equipment and the negligent performance of those services, along with negligent misrepresentation in the course of those services, damages and incapacitate the utility's overhauled equipment: (a) Can the engineering firm be liable in tort to the client? and (b) Is the utility's recovery for damages to its equipment and consequent loss of profits barred by the economic loss doctrine?

to a state supreme court where there was "no proof as to the activities of the Defendants. Hence, the [Plaintiffs] had no case against the Defendants." *Id.* at 106. Here, IPM has failed to offer evidence that would support its claim against MAN, and, thus, has "no case against" MAN, *id.* Therefore we deny IPM's request for certification of a question of law to the CNMI Supreme Court.

### CONCLUSION

IPM has failed to establish evidence of a breach of MAN's standard of care towards CUC. Thus, IPM has failed to "set forth specific facts showing a genuine issue for trial" as required by Rule 56 of the Federal Rules of Civil Procedure. Furthermore, we decline to use our discretion to certify a question of law to the CNMI Supreme Court because IPM has not shown compelling reasons why certification should be granted on appeal when not requested below.

AFFIRMED.