[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14968

_____

D.C. Docket No. 1:15-cv-04279-TWT

CAROL TIMS,
Individually, and on behalf of all others similarly situated,

Plaintiff – Appellant,

versus

LGE COMMUNITY CREDIT UNION,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 27, 2019)

Before MARTIN, JILL PRYOR and JULIE CARNES, Circuit Judges.

JILL PRYOR, Circuit Judge:

According to Carol Tims, when she opened an account at LGE Community Credit Union, LGE promised to use one account balance calculation method in assessing overdraft fees against her account, but then used a different one, which resulted in more fees.  Tims alleged that LGE agreed to impose overdraft fees only when her ledger balance—the amount of money in her account without considering pending debits—was insufficient to cover a transaction.  She alleged that LGE broke that promise by assessing overdraft fees when, based on her *ledger* balance, there was enough money in her account to cover the transaction in question, but based on her *available* balance—the money in her account after considering pending debits and deposits—there was not.

Tims sued LGE in district court for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. §§ 1693-1693r.  The district court dismissed her claims under Federal Rule of Civil Procedure 12(b)(6) after determining that the two parties' agreements unambiguously permitted LGE to assess overdraft fees using the available balance calculation method.

We disagree with the district court's interpretation of the contracts.  Because we conclude that the agreements are ambiguous as to whether LGE could rely on an account's available balance, rather than its ledger balance, to assess overdraft

2

fees, we reverse the district court's dismissal of the case and remand for further proceedings consistent with our opinion.

## I.    BACKGROUND

### A. Congressional Regulation of Overdraft Fees After the Advent of Online Banking

"Overdraft" is a banking term describing a deficit in a bank account caused by drawing more money than the account holds.  Before the development of electronic fund transfer (EFT) systems, banks generally provided overdraft coverage for check transactions only.  *See* Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,033 (Nov. 17, 2009).  When a bank customer overdrew her account by writing a check in an amount that exceeded the amount of funds in the account, her financial institution applied its discretion in deciding whether to honor the customer's draft, in effect extending a small line of credit to its customer and imposing a small fee for the convenience.  *Id.*

Online banking transformed how financial institutions handled overdrafts and overdraft fees.  New EFT systems provided customers with more ways to make payments from their accounts, including automatic teller machine (ATM) withdrawals, debit card transactions, online purchases, and transfers to other accounts.  *Id.*  Most financial institutions chose to extend their overdraft coverage to all EFT transactions.  Some further decided to cover automatically all overdrafts their customers might generate from their EFTs.  *Id.*  These changes had the

3

benefit to financial institutions of "reduc[ing] cost[s]" from manually reviewing individual transactions and furthering "consistent treatment of consumers." *Id.* at 59,033-34. But they came at a significant and sometimes unexpected cost to consumers: financial institutions generally assessed a flat fee each time an overdraft occurred, sometimes charging additional fees—for each day an account remained overdrawn, for example, or incrementally higher fees as the number of overdrafts increased. *Id.* at 59,033.

Congress enacted EFTA with the aim of outlining the rights, responsibilities, and obligations of individuals and institutions using EFT systems. *Id.* In EFTA's implementing regulations (Regulation E, 12 C.F.R. pt. 1005), Congress set out to "assist consumers in understanding how overdraft services provided by their institutions operate and to ensure that consumers have the opportunity to limit the overdraft costs associated with ATM and one-time debit card transactions where such services do not meet their needs." *Id.* at 59,035. Doing away with the practice of automatic enrollment of consumers in overdraft coverage, Regulation E required financial institutions to secure consumers' "affirmative consent" to overdraft services through an opt-in notice. *Id.* at 59,036. The opt-in notice was to be "segregated from all other information[] describing the institution's overdraft service," 12 C.F.R. § 1005.17(b)(1)(i), and be "substantially similar" to a model form (Model Form A-9) provided by the Federal Reserve, *id.* § 1005.17(d).

4

"But the opt-in requirement and model form have not dispelled all the controversy and confusion surrounding overdraft fees." *Chambers v. NASA Fed. Credit Union*, 222 F. Supp. 3d 1, 6 (D.D.C. 2016).  Model Form A-9 does not address which account balance calculation method a financial institution should use to determine whether a transaction results in an overdraft.  *See* 12 C.F.R. pt. 1005, app. A.  Without any such provision in the model form, "some financial institutions have failed to disclose the balance calculation method that they use to determine whether a transaction results in an overdraft." *Chambers*, 222 F. Supp. 3d at 6.

In determining whether a customer has made a withdrawal or incurred a debit that exceeds the balance in her account—an overdraft—financial institutions typically use one of two methods of calculating the balance in a customer's account:  the "ledger" balance method or the "available" balance method.  The ledger balance method considers only settled transactions; the available balance method considers both settled transactions and authorized but not yet settled transactions, as well as deposits placed on hold that have not yet cleared. Consumer Fin. Prot. Bureau, Supervisory Highlights 8 (Winter 2015), *available at* https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf (last visited May 24, 2019).  These two competing methods of calculating

5

a consumer's balance and charging overdraft fees based on that balance lie at the heart of this case.

## B. Factual Background

LGE allegedly charged Tims overdraft fees of $30.00 each on two occasions. Tims's complaint alleged that at the time LGE assessed the overdraft fees, her ledger balance was sufficient to cover each transaction. She alleged that LGE agreed to use the ledger balance calculation method in assessing overdraft fees, and so LGE's use of the available balance calculation method breached her agreements with LGE.

LGE argues that its agreements with Tims unambiguously provided that LGE would use the available balance calculation method in imposing overdraft fees. LGE thus asserts that it did not breach its agreements by imposing fees based on Tims's available balance.

There were two agreements between Tims and LGE: the "Opt-In Agreement" and the "Account Agreement." LGE asked consumers to sign the Opt-In Agreement to obtain their consent to LGE's overdraft policies. The Opt-In Agreement said little about which balance calculation method LGE employs, stating only that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Doc. 29 at 44.[1]

---

[1] All citations in the form "Doc. #" refer to numbered entries on the district court docket.

LGE adopted the Opt-In Agreement to comply with Regulation E, 12 C.F.R. § 1005.17. Again, Regulation E requires financial institutions to secure a consumer's "affirmative consent" before charging overdraft fees and stipulates that consent can be secured through use of an opt-in form "substantially similar" to Model Form A-9. *Id.* § 1005.17(b)(1)(iii), (d). LGE's Opt-In Agreement is nearly an exact copy of Model Form A-9. *Compare id.* pt. 1005, app. A, *with* Doc. 29 at 44.

The second agreement between Tims and LGE, the Account Agreement, contained a "Payment Order" provision explaining that in processing items drawn on a consumer's account, LGE's "policy is to pay [the items] as we receive them." Doc. 29 at 31. The Account Agreement went on to say, "[i]f an item is presented without sufficient funds in your account to pay it" or "if funds are not available to pay all of the items" presented for payment, LGE "may, at [its] discretion, pay" the item or items, creating an overdraft for which LGE will charge a fee. *Id.* at 32.

A separate provision in the Account Agreement, the "Funds Availability Disclosure," addressed the conditions under which funds were available for consumers' use. *Id.* at 37. In this provision, LGE explained that its general policy was "to make funds from your deposits available to you on the same business day that [LGE] receive[s] your deposit," but certain deposits would not be "available" to consumers until the second business day at the earliest. *Id.*

## C. Procedural History

Tims brought this case as a consumer class action, asserting three claims against LGE that are the subject of this appeal.[2]  First, Tims alleged that LGE breached its Opt-In and Account Agreements by assessing overdraft fees using the available balance calculation method.  Second, she alleged that LGE violated the implied covenant of good faith and fair dealing implicit in every contract under Georgia law.[3]  Third, she alleged that LGE's practices failed to accurately describe its overdraft service as required by Regulation E, thus violating EFTA.

LGE filed a Rule 12(b)(6) motion to dismiss all claims, which the district court granted.  Using Georgia's canons of contract construction, the district court determined that the agreements unambiguously permitted LGE to assess overdraft fees using the available balance calculation method.  The court concluded that LGE had neither breached the parties' contract nor the covenant of good faith and fair dealing and that no EFTA violation had occurred.  Tims timely appealed.

---

[2] Tims also asserted claims against LGE for unjust enrichment and money had and received.  On appeal, she does not argue that the district court erred in dismissing these claims, so we do not address their merits.  *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) (stating that a legal claim or argument that has not been briefed on appeal is "deemed abandoned and its merits will not be addressed").

[3] The Account Agreement provided that Georgia law governs the contract.  Because the parties agree that Georgia law applies here, we assume that it does.  *See Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012) ("If the parties litigate the case under the assumption that a certain law applies, we will assume that law applies.").

## II.    STANDARD OF REVIEW

We review *de novo* a district court's grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006). We accept factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). To withstand a motion to dismiss under Rule 12(b)(6), a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

We review *de novo* the issue of whether a contract is ambiguous. *See Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1252 (11th Cir. 2008). Questions of contract interpretation are pure questions of law, also reviewed *de novo*. *Gibbs v. Air Canada*, 810 F.2d 1529, 1532 (11th Cir. 1987).

## III.    DISCUSSION

Tims challenges the district court's dismissal of her claims against LGE for (1) breach of contract; (2) breach of the implied covenant of good faith and fair

9

dealing; and (3) violation of Regulation E of EFTA.  We consider these claims in turn.

## A. Tims Stated a Claim for Breach of Contract.

To state a claim for breach of contract under Georgia law, Tims had to plausibly allege that LGE owed her a contractual obligation, then breached it, causing her damages.  *Norton v. Budget Rent a Car Sys., Inc.*, 705 S.E.2d 305, 306 (Ga. Ct. App. 2010).  Tims alleged that LGE promised to calculate her account balance—and assess overdraft fees in light of that balance—by considering only the ledger balance, then breached that promise by considering the available balance instead.  We must interpret the two agreements between Tims and LGE to decide whether LGE had a contractual obligation to use the available balance calculation method or the ledger balance calculation method for unsettled withdrawals[4] in imposing overdraft fees.

Under Georgia law, courts interpret contracts in three steps:  first, the court determines whether the contract language is clear and unambiguous.  If the language is clear, the court applies its plain meaning; if it is unclear, the court

---

[4]  The parties appear to agree that, as to deposits, the Funds Availability Disclosure permits LGE to place holds on some types of deposits pending clearance of the deposit (ledger balance method), but that as to other types of deposits, LGE has agreed that the deposit will be made immediately available to the customer (available balance method).  The dispute here concerns how debit transactions are to be treated under the Opt-In Agreement and the Account Agreement, with Tims arguing that the relevant documents indicate that the ledger method will be used and LGE arguing that the terms of the agreements provide for use of the available balance method.

proceeds to step two.  At step two, the court attempts to resolve the ambiguity using Georgia's canons of contract construction.  If the ambiguity cannot be resolved using the canons, then the court proceeds to step three, where the parties' intent becomes a question of fact for the jury.  *City of Baldwin v. Woodward & Curran, Inc*., 743 S.E.2d 381, 389 (Ga. 2013).

"The cardinal rule of construction is to ascertain the intention of the parties." *Maiz v. Virani*, 253 F.3d 641, 659 (11th Cir. 2001) (alteration adopted) (internal quotation marks omitted).  A contract is ambiguous when it "leave[s] the intent of the parties in question—i.e., that intent is uncertain, unclear, or is open to various interpretations." *Capital Color Printing, Inc. v. Ahern*, 661 S.E.2d 578, 583 (Ga. Ct. App. 2008) (internal quotation marks omitted).  A contract is unambiguous when, after examining the contract as a whole and affording its words their plain meaning, "the contract is capable of only one reasonable interpretation."  *Id.* (internal quotation marks omitted).

1. **The Plain Language of the Opt-In and Account Agreements Is Ambiguous as to Which Account Balance Calculation Method LGE Uses to Assess Overdraft Fees.**

Both parties argue that the Opt-In and Account Agreements are unambiguous, but they disagree about which account balance calculation method the agreements unambiguously promised to use.  Each party contends that the agreements' plain language clearly supports its own interpretation of LGE's

11

balance calculation method.  After careful review, we disagree with both parties that the agreements are unambiguous.

We turn to the language of the Opt-In and Account Agreements and begin with the Opt-In Agreement.[5]  In relevant part, the Opt-In Agreement explained that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  Doc. 29 at 44.  Each party contends that this language plainly supports its own interpretation of LGE's balance calculation method.  Tims argues that the phrase "enough money in your account" unambiguously referred to the ledger balance because the term "account" is presented without limitation or modification, such as a reference to "available" funds.  LGE argues that "enough" unambiguously referred to the available balance.  LGE consults the dictionary definition of the word "enough"—"occurring in such quantity, quality, or scope as to satisfy fully the demands, wants, or needs of a situation or of a proposed use or end"[6]—then points out that "enough" is synonymous with "available."  Because "enough" and "available" are synonyms,

---

[5] Under Georgia law, "'where multiple documents are executed at the same time in the course of a single transaction, they should be construed together.'"  *Curry v. State*, 711 S.E.2d 314, 317 (Ga. Ct. App. 2011) (quoting *Martinez v. DaVita, Inc.*, 598 S.E.2d 334, 337 (Ga. Ct. App. 2004)).  Neither party disputes that Tims entered into the Opt-In and Account Agreements at the same time when she opened an account with LGE.

[6] *Enough*, Webster's Third New International Dictionary 755 (2002).  In Georgia, "[w]hen interpreting a contract, the language must be afforded its literal meaning and plain ordinary words given their usual significance," and "[d]ictionaries may supply the plain and ordinary meaning of a word."  *Grange Mut. Cas. Co. v. Woodard*, 861 F.3d 1224, 1231 (11th Cir. 2017) (internal quotation marks omitted).

12

LGE argues, a consumer would understand merely by reading the word "enough" that LGE would take only a consumer's available funds into account in calculating the account's balance.

We find neither argument persuasive.  The Opt-In Agreement sheds no light on what "enough money in [an] account" means in the context of determining when an overdraft has occurred.  *Id.*  Both parties' arguments raise the question of how LGE determines what "enough money" is—is it enough money to cover only settled transactions or to cover authorized but not yet settled transactions as well? The Opt-In Agreement is thus ambiguous concerning the account balance calculation method LGE's overdraft service uses for unsettled debit transactions.

The plain language of the Account Agreement is no more helpful.  In describing LGE's overdraft service, the Account Agreement's Payment Order section stated that an overdraft occurs "[i]f an item is presented without sufficient funds in your account to pay it" or "if funds are not available to pay all of the items."  *Id.* at 32.  The conditions under which deposits would be available for consumers' use were set forth in a separate section, the Funds Availability Disclosure.  The Funds Availability Disclosure explained that LGE's "policy is to make funds from [the consumer's] deposits available to [the consumer] on the same business day" that LGE receives the deposit.  *Id.* at 37.  It stipulated that consumers can immediately "withdraw funds" for most deposits, including cash,

13

wire transfers, and money order deposits; however, consumers must wait to "withdraw funds" under certain limited circumstances, including deposits of checks exceeding $5,000 and deposits into repeatedly and recently overdrawn consumer accounts. *Id.* The Funds Availability Disclosure made no mention of debit transactions specifically, referring only to "withdrawals" generally. *Id.*

Each party contends the language of this agreement, too, clearly requires the use of its favored account balance calculation method in charging overdraft fees. Tims argues that the phrase "sufficient funds," by itself, plainly refers to the ledger balance. She also argues that even though the Funds Availability Disclosure said some deposited funds will be considered unavailable to consumers for a period of time, it did not say whether or how the funds' unavailability relates to the financial institution's account balance calculation method for overdraft purposes. Finally, Tims points out that even though the Funds Availability Disclosure explained that certain *deposits* could not immediately be withdrawn by consumers, it said nothing about whether pending debits affected consumers' ability to withdraw funds.

In an argument similar to the one it makes about the Opt-In Agreement, LGE asserts that "sufficient" is synonymous with "available,"[7] and so a consumer

---

[7] "Sufficient" is defined as "[a]dequate; of such quality, number, force, or value as is necessary for a given purpose." *Sufficient*, Black's Law Dictionary 1661 (10th ed. 2014). "Available" is defined as "capable of use for the accomplishment of a purpose: immediately utilizable." *Available*, Webster's Third New International Dictionary 150 (2002).

reading the word "available" and then the term "sufficient" in adjacent sentences would understand the Account Agreement as clearly referring to the available balance calculation method. LGE also notes that the Funds Availability Disclosure stipulated that consumers could use funds only when they were "available," a word also used in the Payment Order subsection of the Account Agreement describing when an overdraft occurs. *See* Doc. 29 at 32 (stating that an overdraft occurs "if funds are not available to pay all of the items").

Neither argument persuades us. We cannot say the Account Agreement unambiguously articulated the account balance calculation method LGE uses for unsettled debit transactions. Nothing in the Account Agreement explained how LGE determines whether funds are "sufficient." Nor did the mere presence of the word "available" in the Account Agreement, in two separate subsections, clearly communicate that LGE would calculate a consumer's account balance for the purpose of assessing overdraft fees based on unsettled transactions. LGE "apparently assumes that the [consumer] will read the word 'available' in [two separate] sections spanning the [12]-page Account Agreement" and conclude that the financial institution uses the available balance calculation method in its overdraft service just because the agreement uses the term "available." *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2017 WL 3597522, at *7 (D. Haw. Apr. 13, 2017). LGE assumes too much. As Tims points out, although the Account

Agreement explained that certain deposits would not immediately be available to consumers, it did not explain that a pending debit would render funds unavailable to consumers.

In the absence of anything in the Account Agreement addressing the account balance calculation method LGE used in its overdraft service for unsettled transactions and given the ambiguity of the terms "sufficient funds" and "available," the Account Agreement failed to clearly indicate which balance calculation method LGE was using to determine when an unsettled debit transaction would result in an assessment of overdraft fees. Other courts, confronting similar terms across subsections of similar account agreements, have agreed. *See, e.g.*, *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 854-56, 856 n.4 (W.D. Mich. 2016) (deciding that the terms "enough money" and "sufficient funds" did not clearly indicate that an available balance method would be used in imposing overdraft fees); *see also Walbridge v. Ne. Credit Union*, 299 F. Supp. 3d 338, 343-46 (D.N.H. 2018) (determining that the terms "enough money," "insufficient funds," and "nonsufficient funds" did not clearly indicate that an available balance method would be used in charging overdraft fees).

Neither the Opt-In Agreement nor the Account Agreement clearly articulated which balance calculation method LGE was using to determine when unsettled transactions would trigger an overdraft. The contracts are ambiguous.

16

## 2. The Agreements Remain Ambiguous After Considering Georgia's Canons of Contract Construction.

Having determined that the language of the Opt-In and Account Agreements

is susceptible to two different constructions, we turn to the second step of contract

interpretation under Georgia law and attempt to resolve the ambiguity using

Georgia's canons of construction.[8]  Applying these canons, the district court

---

[8] Tims also asks us to construe the agreements as contracts of adhesion.  In Georgia, contracts of adhesion are "standardized contract[s] offered on a 'take it or leave it' basis and under such conditions that a consumer cannot obtain the desired product or service except by acquiescing in the form contract," and are "construed strictly against the drafter."  *Walton Elec. Membership Corp. v. Snyder*, 487 S.E.2d 613, 617 n.6 (Ga. Ct. App. 1997).  Because she failed to clearly present this argument before the district court, we will not assess its merits here.  *See In re Pan Am. World Airways, Inc., Maternity Leave Practices & Flight Attendant Weight Program Litig.*, 905 F.2d 1457, 1462 (11th Cir. 1990).  Tims contends that she presented the argument to the district court because her complaint stated that LGE drafted the agreements, which were adhesive in nature.  Tims does not argue, but we note, that she subsequently mentioned the Georgia canon of construction regarding contracts of adhesion once, in a footnote in her opposition to LGE's motion to dismiss, without advancing any argument that her agreement with LGE was a contract of adhesion.  Tims's description of the agreements and her brief reference without argument in a footnote was insufficient to preserve the argument for appeal.  *See U.S. Sec. & Exchange Comm'n v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 812 (11th Cir. 2015) (explaining that a litigant's "fleeting footnote explaining" an argument to the district court "in one sentence . . . is insufficient to properly assert a claim on appeal").

In addition, Tims argues that we should apply the doctrine of *contra proferentem*, a canon of contract construction "that counsels in favor of construing ambiguities in contract language against the drafter."  *Allen v. Thomas*, 161 F.3d 667, 671 (11th Cir. 1998).  Tims likewise failed to preserve this argument for appellate review.  She mentioned the doctrine of *contra proferentem* only once, in the aforementioned footnote, without advancing any argument that it applied.  *See* Doc. 31 at 15 n.3 (noting only that "ambiguities in a contract will be construed against the drafter" (alterations adopted) (internal quotation marks omitted)).  Tims's fleeting reference in a footnote to the doctrine of *contra proferentem* was insufficient to preserve her argument for appeal, and we thus do not address it.  *See Big Apple Consulting USA, Inc.*, 783 F.3d at 812.

Our conclusion that Tims failed to preserve these arguments for purposes of our review of the motion to dismiss does not foreclose her from raising these arguments in the district court at the summary judgment stage.

determined that any ambiguity in the contracts could be resolved.  The district court concluded that the use of the word "available" in the Account Agreement plainly referred to the available balance method for two reasons:  first, based on the close proximity of the words "available" and "sufficient" in the Payment Order subsection, and second, because "available" must be interpreted consistently throughout the Account Agreement, which uses the word in different subsections. We find neither reason compelling.

First, the proximity of the word "available" to the word "sufficient" in the Payment Order subsection of the Account Agreement does not clearly communicate that LGE would use an available balance calculation method when considering unsettled transactions in its overdraft service.  As discussed above, the Account Agreement's Payment Order provision stated that LGE would assess overdraft fees if there were not "sufficient funds in your account to pay [an item]" and just after noting that its "payment policy . . . may reduce the amount of overdraft . . . fees you have to pay if funds are not *available* to pay all of the items."  Doc. 29 at 32 (emphasis added).  The district court concluded that the proximity of "sufficient" to "available" meant the words are somehow linked.  *See* Doc. 67 at 11 ("By including the term 'available' in such close proximity to the term 'sufficient,' the parties indicate that they view both terms to be related.").  No

18

Georgia canon of contract construction supports this conclusion, however.[9]  There

is no rule that words in close proximity should be construed as related to one

another without considering word order and context.  And even if we agreed that

the terms were related to one another, the related terms still did not unambiguously

specify that LGE would apply the available balance calculation method to

unsettled transactions in assessing overdrafts.  A consumer could reasonably

understand the phrase "available . . . sufficient funds" to refer to her ledger

balance:  that available funds are those in her account and sufficient to cover her

draft.  Thus, even read together, the terms "available" and "sufficient" fail to

clearly communicate how unsettled transactions are treated in the balance

calculation method LGE employs in its overdraft services.  So the contract remains

capable of two reasonable constructions.

    Second, we disagree that the Account Agreement was necessarily referring

to an available balance calculation method for unsettled debit transactions based on

the use of the word "available" in a Funds Availability Disclosure provision that

---

[9] The most comparable Georgia canon of contract construction is the last antecedent canon, which provides that "[r]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent." *Deal v. Coleman*, 751 S.E.2d 337, 342 (Ga. 2013) (internal quotation marks omitted); *see also Key v. Ga. Dep't of Admin. Servs.*, 798 S.E.2d 37, 41 (Ga. Ct. App. 2017) (canon applicable in contract as well as statutory construction).  But the last antecedent rule does not apply here because "sufficient funds" is not a limiting clause or phrase and "available" is not a noun. *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (explaining that the doctrine applies to "limiting clause[s] or phrase[s]" that are "read as modifying only the noun or phrase that [they] immediately follow[]").

addresses a completely different matter:  the availability of deposited funds.  The Funds Availability Disclosure provision used variations of the word "available" more than 20 times—in nearly every sentence.  But "available" was never used in conjunction with the word "balance."  And "available" was never defined to exclude unsettled debit transactions for overdraft purposes.  At best, this section equated "available" with "able to be withdrawn."  *See, e.g.*, Doc. 29 at 37 ("This disclosure describes your ability to withdraw funds at LGE . . . . Our policy is to make funds from your deposits available to you on the same business day we receive your deposit.").  LGE's explanation in the Funds Availability Disclosure provision for when deposited funds became "available" to consumers for withdrawal simply did not address how LGE would treat unsettled debits when it calculated a consumer's balance for overdraft fee purposes.

LGE's argument that the agreements clearly promised to use the available balance calculation method does not convince us, either.  LGE asserts that the repeated use of the word "available" unambiguously communicated that overdraft fees would be assessed using the available balance method.  To support its interpretation of the word "available," LGE cites to *Chambers*.  222 F. Supp. 3d at 1.  The dispute in *Chambers*, as in this case, concerned whether a credit union's Opt-In and Account Agreements obligated the credit union to use the ledger or the available balance method in its overdraft service.  *Id.* at 10.  The court dismissed

20

Chambers's breach of contract claims after concluding that the Opt-In Agreement unambiguously stated that the credit union would use the available balance calculation method.  *Id.*

Several significant details distinguish *Chambers* from this case, however. Importantly, in *Chambers*, the Opt-In Agreement used the phrase "available balance."  *Id.*  In addition, the Account Agreement in *Chambers* contained a subsection addressing "Available Balances to Make Transactions," which linked the concept of available balance to the mechanics of when and how the bank would assess overdrafts.  *Id.* at 10-11.  Finally, the Opt-In Agreement in *Chambers* provided examples illustrating when an account would not have "enough money" and thus be subject to an overdraft.  *Id*. at 10.

None of those factors is present in this case.  The agreements here did not use the phrase "available balance"; the Account Agreement nowhere explained the mechanics of how and when LGE would assess overdrafts, nor linked the concept of an "available balance" to those mechanics; and the Opt-In Agreement provided no examples illustrating when a consumer would not have "enough money" to cover a transaction and thereby trigger an overdraft.  Because of these three distinctions, we cannot say the Opt-In and Account Agreements in this case clearly demonstrated the parties' intent that LGE would use the available balance calculation method when assessing overdraft fees.  *See Walbridge*, 299 F. Supp. 3d

at 345-46 (concluding based on the same three factors that the financial institution did not clearly communicate an intent to use the available balance in charging overdraft fees).

Neither the Opt-In Agreement nor the Account Agreement read separately, nor the two agreements read together, clearly articulated LGE's balance calculation method for charging overdraft fees. Applying the Georgia canons of construction does nothing to clarify the contracts' ambiguity. Because the language remains ambiguous after considering both the plain language of the contracts and the Georgia canons of construction before us,[10] the parties' intent will become a question for the jury should neither party be granted summary judgment. The district court therefore erred in dismissing Tims's claim for breach of contract.

## B. Tims Stated a Claim Against LGE for Breach of the Covenant of Good Faith and Fair Dealing.

Tims next argues that the district court erred in dismissing her claim that LGE breached the implied covenant of good faith and fair dealing under Georgia law. We agree.

Under Georgia law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Brack v.*

---

[10] In note 8, *supra*, we noted that the doctrine of *contra proferentem* had not been preserved for purposes of our review but Tims could advance it during the summary judgment stage of litigation.

*Brownlee*, 273 S.E.2d 390, 392 (Ga. 1980) (internal quotation marks omitted). That implied promise "becomes a part of the provisions of the contract, but the covenant cannot be breached apart from the contract provisions [that] it modifies and therefore cannot provide an independent basis for liability." *Myung Sung Presbyterian Church v. N. Am. Assoc. of Slavic Churches & Ministries*, 662 S.E.2d 745, 748 (Ga. Ct. App. 2008). A plaintiff "must set forth facts showing a breach of an actual term of an agreement" to state a claim for breach of the implied duty of good faith and fair dealing. *Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.*, 426 F. Supp. 2d 1356, 1370 (N.D. Ga. 2006).

Given our conclusion on the breach of contract claim, Tims's allegations sufficiently "set forth facts showing a breach of an actual term of [the] agreement." *Id.* Tims alleged that LGE had a contractual obligation to use the ledger balance calculation method and breached that promise; therefore, Tims's claim for breach of the implied covenant of good faith and fair dealing has been properly pled. The district court erred in dismissing this claim.

**C. Tims Stated a Claim Against LGE for Violating EFTA.**

Tims alleges, and we think it plausible, that LGE violated EFTA Regulation E. Under EFTA, Congress charged the Federal Reserve Board—and, later, the Consumer Financial Protection Bureau (CFPB)—with promulgating regulations to

23

carry out EFTA's purposes.  15 U.S.C. § 1693b(a)(1); *see also id.* § 1693a(4).[11]

One of EFTA's central features is a requirement that financial institutions disclose

"[t]he terms and conditions of electronic fund transfers involving a consumers

account . . . in accordance with the regulations of the" CFPB.  *Id.* § 1693c(a).

Regulation E is part of the CFPB's implementation of this requirement.

Regulation E requires financial institutions to give consumers a "notice . . .

describing the institution's overdraft service."  12 C.F.R. § 1005.17(b)(1)(i).  The

notice must be "substantially similar to Model Form A-9" and describe the

"financial institution's overdraft service" in a "clear and readily understandable"

way.  *Id.* § 1005.17(d)(1), 1005.4(a)(1).  *See also* 15 U.S.C. § 1693c (requiring

financial institutions to make disclosures "in accordance with the regulations of

the" CFPB "in readily understandable language").  Before financial institutions

may charge overdraft fees, they must give consumers "a reasonable opportunity . . .

to affirmatively consent, or opt in, to the service."  12 C.F.R. § 1005.17(b)(1)(ii).

Congress created a private right of action for consumers against financial

institutions that fail to provide proper notice describing their overdraft service.  *See*

15 U.S.C. § 1693m.  Congress further directed the CFPB to draft boilerplate

language to help financial institutions "compl[y] with the disclosure requirements"

---

[11] Congress reassigned responsibility for enforcing EFTA from the Federal Reserve Board to the CFPB in 2010.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, Title X, § 1084, 124 Stat. 1376, 2081–83.

for overdraft services.  15 U.S.C. § 1693(b).  Model Form A-9, the template for

LGE's Opt-In Agreement, was issued pursuant to this directive.

As we have explained, the Opt-In Agreement LGE gave Tims is ambiguous

because it could describe either the available or the ledger balance calculation

method for unsettled debits.  As a result, it is plausible that the notice does not

describe the overdraft service in a "clear and readily understandable" way.  12

C.F.R. § 1005.4(a)(1).  It is also plausible that Tims had no reasonable opportunity

to affirmatively consent to LGE's overdraft services.  *Id.* § 1005.17(b)(1)(ii).

Affirmative consent requires "plain and clear consent . . . before certain acts or

events, such as changes in policies that could impair an individual's rights or

interests."  Affirmative-Consent Requirement, *Black's Law Dictionary* (11th ed.

2019).  A notice that does not adequately convey the circumstances in which a

financial institution will charge overdraft fees may not provide a consumer all the

information she needs to give plain and clear consent.  Here, Tims plausibly did

not have a reasonable opportunity to affirmatively consent because the notice gave

her no way to know whether LGE would use the available balance or the ledger

balance method to charge her overdraft fees.

But that is not the end of the matter.  Congress provided a safe harbor from

EFTA liability for "any failure to make disclosure in proper form if a financial

institution utilized an appropriate model clause issued by the" CFPB.  15 U.S.C.

25

§ 1693m(d)(2).[12]  The CFPB interprets the safe harbor to preclude liability "for

failure to make disclosures in proper form" provided the institution "uses [the

model form's] clauses accurately to reflect its services."  12 C.F.R. pt. 1005, app.

A (Supp. I).

In its notice defining the term "overdraft," LGE copied verbatim the

definition of that term provided in Model Form A-9:  "[a]n overdraft occurs when

you do not have enough money in your account to cover a transaction, but we pay

it anyway."  LGE seeks refuge in the safe harbor because, it argues, it used an

appropriate model form to describe its overdraft service.  We disagree that LGE is

protected from liability by the safe harbor.

LGE emphasizes that its form is accurate, and that may be so.  After all, we

have concluded it could correctly refer to either the ledger balance or the available

balance method.  But that does not conclude the inquiry.

The relevant question is whether the claim Tims asserts is one for LGE's

"failure to make disclosure in proper form."  The answer must be no.  The statute's

text, which is where all statutory interpretation must begin, makes that much plain.

*See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004).  "Form" has

---

[12] The safe-harbor provision also shields financial institutions from liability for "any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof." 15 U.S.C. § 1693m(d)(1). LGE does not argue this provision precludes liability here, and we express no view on the matter.

many meanings, but it is best read here to refer to "[p]rocedure as determined or governed by custom or regulation," as distinct from content or substance. *Webster's New College Dictionary* 448 (3d ed. 2008); *see also* Form, *Black's Law Dictionary* (11th ed. 2019) (defining "form" as "[t]he outer shape, structure or configuration of something, as distinguished from its substance or matter" or an "[e]stablished . . . procedure"); Form, *Oxford English Dictionary* (2d ed. 1989) (defining "in due or proper form" to mean "according to the rules or prescribed methods"). Thus, making disclosure in proper form means making the disclosure according to proper procedures. The safe-harbor provision insulates financial institutions from EFTA claims based on the *means* by which the institution has communicated its overdraft policy. But it does not shield them for claims based on their failure to make adequate disclosures. A financial institution thus strays beyond the safe harbor when communications within its overdraft disclosure inadequately inform the consumer of the overdraft policy that the institution actually follows. *See Berenson v. Nat'l Fin. Servs., LLC*, 403 F. Supp. 2d 133, 151 (D. Mass. 2005) (holding the safe harbor "insulates an institution only from a challenge as to the form—not the adequacy—of the disclosure").

Regulation E sets out procedures for how financial institutions must present their disclosures. To comply with the regulation, financial institutions must make the disclosure "in writing, or if the consumer agrees, electronically" and must

27

further "segregate[]" the notice "from all other information."  12 C.F.R.

§ 1005.17(b)(1)(i).  The format of the notice required by § 1005.17(b)(1)(i) must

be "substantially similar to Model Form A-9."  *Id.* § 1005.17(d).  Financial

institutions must also "[p]rovide[] the consumer with confirmation of the

consumer's consent in writing, or if the consumer agrees, electronically."  *Id.*

§ 1005.17(b)(1)(iv).  These provisions set out the "proper form" for presenting a

disclosure.

Tims does not allege LGE failed to do any of that.  Instead, she challenges

the substance of the Opt-In Agreement, which she says failed to give her enough

information to give affirmative consent to LGE's overdraft service.  As its text

makes clear, the safe-harbor provision LGE invokes does not preclude liability

when, as in this case, the content of the Regulation E disclosure is at issue.

Because Tims challenges only LGE's failure to make an adequate disclosure, and

not its failure to make the disclosure "in proper form," LGE cannot seek refuge

under the safe harbor provision.  This is so whether or not the form accurately

describes the overdraft service.  In this, our ruling is consistent with the great

weight of district court authority to have considered the matter.  *See Salls v. Dig.

Fed. Credit Union*, 349 F. Supp. 3d 81, 91 (D. Mass 2018) (collecting cases).

Tims's complaint challenged the substance of LGE's Opt-In Agreement.

Because the safe harbor does not protect financial institutions from challenges to

28

the substance of Opt-In Agreements, Tims's EFTA claim survives a motion to dismiss, and the district court erred in granting the motion.

## IV.    CONCLUSION

For the foregoing reasons, we reverse the district court's order granting LGE's motion to dismiss and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**