[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12547

_____

D.C. Docket No. 1:17-cv-22462-UU


CIRCUITRONIX, LLC,

                                    Plaintiff-Appellee-Cross Appellant,

                     versus

KINWONG ELECTRONIC (HONG KONG) CO., LTD.,
SHENZEN KINWONG ELECTRONIC CO., LTD.,

                                    Defendants-Appellants-Cross Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(April 8, 2021)

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR, Circuit Judge, and SELF,[*]
District Judge.

WILLIAM PRYOR, Chief Judge:

_____

[*] Honorable Tilman Eugene Self III, United States District Judge for the Middle District
of Georgia, sitting by designation.

These appeals raise a preliminary issue of civil procedure and three issues about the merits of a breach-of-contract action between a manufacturer and a distributor. A jury found that the manufacturer breached its duty to sell its products to certain customers exclusively through the distributor. The manufacturer appeals the denial of a directed verdict as to the status of two customers under the contract. The distributor cross-appeals a ruling that invalidated the contract's liquidated-damages clause and a ruling that prevented it from pursuing lost-profit damages. The parties dispute if we may consider the directed-verdict issue or if the manufacturer's post-trial motion was untimely. The motion was due on a day when the clerk's office was closed by court order, but the manufacturer could have filed it electronically. We conclude that, under Federal Rule of Civil Procedure 6, the closure of the clerk's office renders the office inaccessible and tolls the filing deadline, which makes the motion timely. Fed. R. Civ. P. 6(a)(3). We also agree with the rulings of the district court on the merits, so we affirm.

## I. BACKGROUND

The Shenzhen Kinwong Electronic Company is a Chinese manufacturer of printed circuit boards. These boards are used in electronic devices to connect electronic components. It uses a Hong Kong-based subsidiary, Kinwong Electronic (Hong Kong) Company, Limited, to sell its products. Around 2005, the two

companies—collectively known as Kinwong—sought to expand their sales beyond Asia but had trouble breaking into other markets.

To expand its reach, Kinwong in 2005 entered into a contract with Circuitronix, LLC, a Florida-based distributor that resells printed circuit boards. The contract gave Circuitronix the exclusive right to sell Kinwong's products to customers that Circuitronix recruited. It obligated Kinwong to fulfill orders that Circuitronix generated, and it specified the terms of those sales. It also barred Kinwong from doing business, directly or indirectly, with customers that Kinwong obtained through Circuitronix.

Circuitronix primarily obtained orders from electronic-manufacturing-services companies. Those companies incorporate printed circuit boards into products that they manufacture for other companies. For example, Circuitronix sold Kinwong's boards to the Kimball Electronics Corporation, and Kimball in turn used the boards to make products for its client companies.

In 2010, the parties modified their relationship through a settlement agreement. The modification became necessary after Circuitronix asserted that Kinwong had violated the exclusivity requirement of the original agreement, such as by selling boards to the end-clients of Kimball. The settlement agreement superseded and replaced the original agreement to the extent the two documents conflicted, but the original agreement otherwise remained in effect.

3

The settlement agreement contained a "Covenant Not to Circumvent," which codified the exclusivity requirement for companies listed on a Schedule A. Kinwong promised in the covenant that, for entities listed on Schedule A, it would not "directly or indirectly [negotiate or transact with] . . . any entity listed on Schedule A, except through Circuitronix" or "circumvent, attempt to circumvent, avoid, or by-pass Circuitronix in any way" "[u]ntil May 24, 2012 or . . . for two (2) years from the date of the last purchase order filled by Kinwong from that particular entity, whichever comes later." It also affirmed that, "with respect to Kimball," it would not "circumvent the intents and purposes of this Agreement by selling its products to those of Kimball's customers [for] whom Circuitronix is selling Kinwong's product to Kimball so that Kimball will be able to satisfy its customer's requirements."

The settlement agreement also added a liquidated-damages clause. This clause applied to breaches of specified provisions of the agreement, including the covenant. The parties agreed that it would be "extremely difficult" to determine actual damages if Kinwong were to breach the covenant and that the relationships between Circuitronix and the Schedule A companies were worth millions of dollars to Circuitronix. They decided that Kinwong would need to pay $2 million in liquidated damages for each breach that it caused.

4

The covenant and the liquidated-damages clause became important when Circuitronix sued Kinwong in 2017. Circuitronix invoked the jurisdiction of the district court based on diversity of citizenship. 28 U.S.C. § 1332. It alleged that Kinwong "repeatedly and systematically" breached the covenant. It pleaded claims of breach of contract and unjust enrichment. The district court dismissed the claims of unjust enrichment but permitted the breach-of-contract claims to proceed to trial.

Before trial, the district court placed limits on the kinds of damages that Circuitronix could seek. Circuitronix had planned to seek liquidated damages or, in the alternative, lost-profit damages. But the district court granted Kinwong partial summary judgment as to the unenforceability of the liquidated-damages clause. And it granted Kinwong's motion *in limine* to bar Circuitronix from seeking lost-profit damages. The district court explained that it was required to bar lost-profit damages because Circuitronix had failed to disclose its computation of those damages, and the failure was neither substantially justified nor harmless. It twice revisited the issue of lost-profit damages, and it twice reaffirmed its ruling.

The district court held a nine-day jury trial in 2019. During trial, Kinwong moved under Federal Rule of Civil Procedure 50(a) for a directed verdict as to the status of two of its customers. Fed. R. Civ. P. 50. The operative Schedule A identified the Lear Corporation as a client that Circuitronix recruited for Kinwong,

5

and it specified that Lear purchased Kinwong's products on behalf of General Motors and Nissan. Circuitronix argued that Kinwong breached the covenant not to circumvent when it sold products to General Motors and Nissan directly. Kinwong sought a directed verdict that, as a matter of contract interpretation, General Motors and Nissan fell outside the ambit of the covenant. The district court reserved its ruling during trial.

The jury found for Circuitronix. It awarded Circuitronix just over $1 million in compensatory damages. These damages reflect the out-of-pocket losses that Circuitronix sustained because of Kinwong's breaches.

After the trial concluded, the district court denied Kinwong's motion for a directed verdict. It concluded that Kinwong's proposed reading of the covenant was incorrect. So it entered judgment for Circuitronix on June 6.

Under Rule 50(b), Kinwong had 28 days after the entry of judgment to renew its motion. *Id.* R. 50(b). Because this clock ran to Thursday, July 4, a legal holiday, Kinwong's deadline automatically tolled to July 5. *See id.* R. 6(a)(1), (6). But Kinwong did not file its renewed motion until Monday, July 8.

Circuitronix argued that this motion was untimely. Kinwong responded that, because the clerk's office was closed on Friday, July 5, its deadline tolled to July 8 and made its filing timely. *See id.* R. 6(a)(3) (ordinarily extending the deadline for

filing "if the clerk's office is inaccessible . . . on the last day for filing under Rule 6(a)(1)").

The district court denied Kinwong's renewed motion. It did not address the issue of timeliness. Instead, it reiterated that Kinwong's motion failed as a matter of contract interpretation.

## II. STANDARDS OF REVIEW

We review *de novo* the interpretation of the Federal Rules of Civil Procedure, *Mega Life & Health Ins. Co. v. Pieniozek*, 585 F.3d 1399, 1403 (11th Cir. 2009), and of contracts, *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1237 (11th Cir. 2019). We also review *de novo* the denial of a motion for a directed verdict. *State Farm Mut. Auto. Ins. Co. v. Williams*, 824 F.3d 1311, 1315 (11th Cir. 2014). And we review *de novo* a summary judgment. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). When a district court imposes discovery sanctions, our review is "sharply limited" to an abuse-of-discretion standard and "a determination that the findings of the trial court are fully supported by the record." *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1211 (11th Cir. 2010) (internal quotation marks omitted).

### III. DISCUSSION

We divide our discussion in three parts. We first review the denial of Kinwong's motions for a directed verdict. We then consider the enforceability of liquidated damages. We last address the exclusion of lost-profit damages.

### A.  The District Court Did Not Err by Denying Kinwong's Rule 50 Motions.

Circuitronix contests both the timeliness of Kinwong's Rule 50(b) motion and the merits of its argument. Because Circuitronix preserved its objection about timeliness, we would not be able to consider Kinwong's challenge on the merits if its Rule 50(b) motion were untimely. *Rosenberg v. DVI Receivables XIV, LLC*, 818 F.3d 1283, 1292 (11th Cir. 2016); *see also Escribano v. Travis County*, 947 F.3d 265, 271–72 (5th Cir. 2020). We conclude that Kinwong's filing was timely but fails on the merits.

#### 1.  Kinwong's Rule 50(b) Motion Was Timely.

If a party makes an unsuccessful Rule 50(a) motion during trial, it must file a Rule 50(b) motion to preserve the issue for appeal. *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 401 (2006). It has 28 days after the entry of judgment to file this renewed motion. Fed. R. Civ. P. 50(b). The district court may not extend the 28-day window. *Id.* R. 6(b)(2). But Rule 6 automatically extends the filing deadline in a few circumstances. For example, the last day of Kinwong's 28-

8

day window fell on Thursday, July 4, 2019—a legal holiday—so Rule 6 tolled its deadline at least to July 5. *Id.* R. 6(a)(1)(C), (a)(6)(A).

The question here is whether the closure of a courthouse tolls the filing deadline. Rule 6 establishes that "[u]nless the court orders otherwise, if the clerk's office is inaccessible . . . on the last day for filing . . . , then the time for filing is extended to the first accessible day that is not a Saturday, Sunday, or legal holiday." *Id.* R. 6(a)(3)(A). The Chief Judge of the Southern District of Florida had designated July 5 as a holiday such that "the Court will be closed." The timeliness of Kinwong's Rule 50(b) motion—filed on Monday, July 8—depends on whether the closure of the courthouse made the clerk's office inaccessible.

We conclude that the closure of the courthouse—and with it, the physical closure of the clerk's office—made the clerk's office inaccessible for purposes of Rule 6(a)(3)(A). As we have explained in another context, "[o]fficial closure of the [c]lerk's office for any reason makes that office 'inaccessible.'" *Chao Lin v. U.S. Att'y Gen.*, 677 F.3d 1043, 1045 (11th Cir. 2012) (interpreting Federal Rule of Appellate Procedure 26(a)). This rule distinguishes official closure from inaccessibility that arises while the clerk's office remains physically open—where the office is open but difficult to access, we require proof of extenuating circumstances. *Id.* at 1045–46.

9

We reject the argument that the clerk's office remained accessible on July 5 because Kinwong could have filed its motion electronically. Rule 6 refers to the clerk's physical office. *See* Fed. R. Civ. P. 6(a)(4)(B) (tying deadlines for non-electronic filing to "when the clerk's office is scheduled to close"). The clerk's office is inaccessible when its building is officially closed or otherwise unavailable, even if the parties are still able to submit filings electronically, *see id.* R. 6, advisory committee's note to 2009 amendment; *Chao Lin*, 677 F.3d at 1045–46, or through other means, *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 747 (9th Cir. 2001).

Circuitronix responds that other aspects of the Federal Rules support its interpretation of accessibility, but we do not see how. True, "an outage of the electronic filing system" is sufficient to make the clerk's office inaccessible. Fed. R. Civ. P. 6, advisory committee's note to 2009 amendment. But we know that other problems, including weather, remain independent triggers of inaccessibility. *Id.* So an outage is not a necessary condition of inaccessibility. Nor does a recent amendment to Rule 5—making electronic filing ordinarily mandatory for represented parties, *id.* R. 5(d)(3)(A)—limit the scope of inaccessibility under Rule 6. We presume that a change to one provision does not impliedly amend another provision, *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The*

10

*Interpretation of Legal Texts* § 55, at 327–28 (2012), and nothing displaces that presumption here. Kinwong's Rule 50(b) motion was timely.

### 2.  Kinwong's Rule 50 Motions Are Meritless.

Because we can reach the merits of Kinwong's Rule 50 motions, we must decide a question of contract interpretation. This diversity suit is governed by Florida law, so we follow the Florida rules for contract interpretation. Florida courts interpret contract provisions based on their plain meaning in the light of the entire contract. *Kel Homes, LLC v. Burris*, 933 So. 2d 699, 702 (Fla. Dist. Ct. App. 2006); *Moore v. State Farm Mut. Auto. Ins. Co.*, 916 So. 2d 871, 875 (Fla. Dist. Ct. App. 2005).

The question for us is whether the following covenant not to circumvent barred Kinwong from selling its products to General Motors and Nissan directly:

> Covenant Not to Circumvent Until May 24, 2012 or, with respect to any particular entity listed on Schedule "A," for two (2) years from the date of the last purchase order filled by Kinwong from that particular entity, whichever comes later, Kinwong . . . shall not directly or indirectly commence negotiations to enter into any type of business transaction, or enter into any type of business transaction, with any entity listed on Schedule A, except through Circuitronix, nor shall Kinwong circumvent, attempt to circumvent, avoid, or by-pass Circuitronix in any way. . . .

The operative Schedule A, adopted in 2013, lists several companies that Circuitronix recruited for Kinwong, to which Kinwong could sell products only through Circuitronix. It listed Lear as one such company:

11

B) Lear: All Locations shown [on Lear's website] and Automotive companies who we have existing projects for:

1. GM
2. Nissan
3. Leoni

The parties disagree about the effect of listing General Motors and Nissan as Lear's customers. They agree that this addition makes those companies "entit[ies] listed on Schedule A." But they disagree as to whether Kinwong could deal with General Motors and Nissan directly.

The parties assume that this question turns on the meaning of the word "from" in the covenant. Because the covenant in relevant part runs for two years "from the date of the last purchase order filled by Kinwong *from* [a covered] entity," a first purchase order is necessary to trigger the protection. In Kinwong's view, Circuitronix must have placed an order "directly from" General Motors and Nissan to be able to regulate Kinwong's relationships with those companies. In Circuitronix's view, the triggering order could have come "directly or indirectly from" General Motors and Nissan—that is, through Lear.

We agree with Circuitronix that Kinwong breached the covenant through its sales to General Motors and Nissan, but for a different reason. Whether or not the indirect relationships that Circuitronix has with General Motors and Nissan are protected by the covenant, no one disputes that the direct relationship between Circuitronix and Lear is protected. So Kinwong could not "circumvent, attempt to

12

circumvent, avoid, or by-pass" the relationship between Circuitronix and Lear "in any way." Kinwong violated this restriction when it sold products to General Motors and Nissan—two end-clients of Lear—without going through Lear. *See Circumvent*, *Webster's New International Dictionary* (3d ed. 1993) ("to go around . . . or bypass without going through"; "to overcome or avoid the intent, effect, or force of").

Our reading is confirmed by language in the covenant about the Kimball Electronics Corporation. The covenant established that Kinwong could not circumvent the relationship between Circuitronix and Kimball by selling its products to Kimball's end-clients. Kinwong argues that, because the covenant specified this prohibition as to Kimball but not to Lear, it was free to sell to Lear's end-clients. Although we ordinarily try to avoid surplusage, in this instance we "prefer ordinary meaning to an unusual meaning that w[ould] avoid surplusage." Scalia & Garner, *Reading Law* § 26, at 176. In context, the specific prohibition of circumventing the relationship between Circuitronix and Kimball in a particular way is redundant with the general prohibition on circumventing Circuitronix's exclusive relationships "in any way." And the specific prohibition proves that the parties understood that a sale to end-clients was one way that circumvention could occur.

13

*B.  The District Court Did Not Err When It Ruled the Liquidated-Damages Clause Unenforceable.*

Circuitronix cross-appeals the partial summary judgment in favor of Kinwong on the issue of liquidated damages. It contends that the liquidated-damages clause in the settlement agreement is enforceable. We disagree.

Under Florida law, a liquidated-damages clause is enforceable only if two conditions are satisfied. First, at the time the parties executed their contract, the actual damages that would follow from a breach must not have been readily ascertainable. *Lefemine v. Baron*, 573 So. 2d 326, 328–29 (Fla. 1991). And second, the stipulated damages must not be "so grossly disproportionate to any damages that might [have] reasonably [been] expected to follow from a breach as to show that the parties could have intended only to induce full performance, rather than to liquidate their damages." *Id.* at 328. If it is unclear whether "a provision for payment of an arbitrary sum" is a penalty or genuine liquidated damages, then Florida courts tend to construe the provision as an unenforceable penalty. *T.A.S. Heavy Equip. v. Delint, Inc.*, 532 So. 2d 23, 25 (Fla. Dist. Ct. App. 1988).

We need not consider the first condition because it is clear that the second condition is not satisfied. The question of disproportionality operates as a proxy for the parties' intentions at the time of contracting, so we ask what damages could have reasonably been expected at that point. *See Hyman v. Cohen*, 73 So. 2d 393, 401 (Fla. 1954) (en banc). Here, the parties set liquidated damages at $2 million for

14

each breach of the covenant not to circumvent, among other provisions. That sum well exceeds the actual damages that might have been expected from any individual breach. The owner of Circuitronix acknowledged that Kinwong would owe liquidated damages if it sold $10,000 of printed circuited boards to a distributor which then resold the boards to a customer covered by the covenant. And most of the allegedly breaching sales involved much less than $10,000. We grant that the value of the sales is not the full measure of damages; Kinwong's breaches affected Circuitronix's relationships with its customers and its access to future business opportunities. *Cf. Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157, 1161 (7th Cir. 1997). But however much value we could ascribe to "goodwill" or "relationship building," the parties were doing only about $3 million of *total* business each year when they adopted the liquidated-damages clause—five years into their contractual relationship. So $2 million a breach was grossly disproportionate to the foreseeable actual damages, and the disproportionality amounts to an unenforceable penalty.

We are unpersuaded by Circuitronix's counterarguments. It first tries to narrow the meaning of "breach." In its view, multiple "breaching acts"—the individual sales—constitute only one breach when they relate to the same project or customer. This reading belies the plain meaning of a breach—that it occurs whenever there is a violation of a contract. *Breach*, *Black's Law Dictionary* (11th

15

ed. 2019). And it finds no support in the parties' agreements. Circuitronix points out that the covenant discusses breaches in terms of business "transaction[s]," but that term does not by itself limit the scope of a breach. Discrete sales can be separate transactions even if they are part of a larger project or for the same customer. *Transaction*, *Webster's New International Dictionary* (3d ed. 1993) ("an act, process, or instance of transacting"). We have no reason to depart from the ordinary meaning of a breach.

Circuitronix argues, in the alternative, that the district court should have found a way to sever impermissible applications of the liquidated-damages clause from the rest of the clause. True, the settlement agreement included a severability clause. But the liquidated-damages clause here is not divisible, so it is unlike a severable clause that sets different amounts of liquidated damages for different kinds of breaches. *Cf. Secrist v. Nat'l Serv. Indus., Inc.*, 395 So. 2d 1280, 1282–83 (Fla. Dist. Ct. App. 1981). Indeed, Circuitronix does not propose any terms that might be severable. Instead, it seems to suggest that the district court should have evaluated the proportionality of each breach on a case-by-case basis. Severability does not work that way. *See Shotts v. OP Winter Haven, Inc.*, 86 So. 3d 456, 459 (Fla. 2011). And, again, we are concerned with the parties' intent at the time of contracting, so a post hoc assessment of proportionality would be beside the point.

16

*C. The District Court Did Not Abuse Its Discretion by Excluding Lost-Profit Damages.*

Circuitronix also cross-appeals the district court's refusal to allow it to seek lost-profit damages. The district court excluded lost-profit damages because Circuitronix failed to disclose its computation of those damages. Rule 26 requires a party to include in its initial discovery disclosures "a computation of each category of damages claimed" and to supplement those disclosures promptly if they are incomplete or incorrect. Fed. R. Civ. P. 26(a)(1)(A)(iii), (e)(1)(A).

Rule 37(c)(1) prescribes sanctions for failure to comply with these disclosure rules:

> If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> (B) may inform the jury of the party's failure; and
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi).

*Id.* R. 37(c)(1). The district court concluded that Circuitronix's failure was neither substantially justified nor harmless and that exclusion was mandatory absent one of those two mitigating circumstances.

Circuitronix does not dispute that its failure to disclose its computations of lost profits was unjustified, but it argues that the district court abused its discretion

17

when it concluded that the failure was not harmless. In its view, its omission was harmless because Kinwong could have done the computations itself. Circuitronix had disclosed how it planned to do the computations—"the simple mathematical formula of Kinwong's sales revenue multiplied by [Circuitronix's] profit margin"—and Kinwong had access to the underlying numbers.

We conclude that the district court did not abuse its discretion on this issue. Although we have not settled the meaning of harmlessness under Rule 37 and, in particular, its relationship to prejudice, we need not do so here. *Cf. Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 603 (11th Cir. 2019) (J. Carnes, J., concurring specially) (finding support for a reading of Rule 37 that limits harmlessness to a category narrower than all non-prejudicial omissions); *id.* at 607–08 & n.4 (Tjoflat, J., dissenting) (same); *see also Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003) (distinguishing harmlessness from lack of prejudice for purposes of Rule 37). We reach our conclusion even if we assume that harmlessness goes to the broader issue of prejudice. *Cf. Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331, 1342 & n.4 (11th Cir. 2020).

Circuitronix itself acknowledges that Kinwong suffered some degree of prejudice. It admits that it never specified how it would calculate its profit margin, an issue of importance in the calculation of lost-profit damages. Even if Circuitronix could have created multiple sets of computations to account for the

18

possible methods, the ease or complexity of that task is not determinative of harmlessness. The complexity of damages computations can be evidence that an omission was harmful, *Mee Indus.*, 608 F.3d at 1222, but so can other problems. As Kinwong points out, Circuitronix's failure to disclose hampered Kinwong's damages expert from preparing his analysis before trial. *Cf. Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1413 (11th Cir. 2011). The district court did not abuse its discretion by finding harm.

Circuitronix also argues that exclusion was too severe a penalty in the circumstances. It is unclear if Circuitronix views the availability of lesser sanctions as contingent on its showing of harmlessness or if it believes that the district court has discretion to impose lesser sanctions even for violations that are unjustified and not harmless. The former falls with our conclusion about harmlessness, but the latter might be persuasive: the Second, Sixth, and Seventh Circuits have concluded that a district court has this discretion. *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 298 (2d Cir. 2006); *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 783–84 (6th Cir. 2003); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 615–16 (7th Cir. 2002); *see also Taylor*, 940 F.3d at 603 (J. Carnes, J., concurring specially) (discussing a circuit split on this issue). If they are right, then the district court committed legal error when it interpreted exclusion to be a mandatory sanction absent substantial justification or harmlessness, and legal error

19

is a *per se* abuse of discretion. *Sec. & Exch. Comm'n v. Marin*, 982 F.3d 1341, 1352 (11th Cir. 2020).

But Circuitronix forfeited the issue of the discretion to impose lesser sanctions. It never challenged in the district court the assumption that Rule 37(c)(1) makes exclusion mandatory for violations that are neither substantially justified nor harmless. "[A]bsent extraordinary circumstances"—and we see none here—we will not consider "legal theories and arguments not raised squarely before the district court . . . for the first time on appeal." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). Moreover, even if Circuitronix had preserved the issue below, it has not squarely raised or briefed the issue on appeal. Because Circuitronix forfeited the issue, we express no opinion on the meaning of Rule 37(c)(1), and "it follows that the judgment is due to be affirmed." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014).

## IV. CONCLUSION

We **AFFIRM** the judgment of the district court.

20